. [Civ. No. 693.    Third Appellate District.—March 7, 1910.]

In the Matter of the Estate of BASIL CAMPBELL, Deceased. G. WYATT WHEELER and JOHN W. WHEELER, Appellants, v. MARY J. CAMPBELL, Executrix, and LEONORA WILLIAMS, Legatee and Devisee, Respondents.

ESTATES OF DECEASED PERSONS—PETITION FOR PARTIAL DISTRIBUTION BY HEIRS—ANSWER—TRIAL OF ISSUES—WILL—OBJECTION UPON APPEAL.—Where persons claiming to be heirs of a deceased person made a petition for partial distribution to them as such, and an answer thereto was filed by the executor and by the devisee and legatee under the will, taking issue upon their alleged heirship, and a trial was had of such issue, and findings made thereupon against the claim of heirship, neither party will be allowed to object upon appeal for the first time, that no issue existed to be tried as to heirship, and that the matter must rest upon the terms of the will.

ID.—SUFFICIENCY OF PETITION—ABSENCE OF DEMURRER—ANSWER—THEORY OF TRIAL—WILL NOT PRODUCED—OBJECTION UPON APPEAL. Where no demurrer was interposed to the petition for partial distribution, and no objection was made to any testimony as not being within the issues presented by the petition and the answer thereto, and the will was not produced in evidence, and the case was tried upon the theory that all of the material issues were properly presented, without objection by either party, an objection that there was no issue, because of the will to which the petitioners were not parties, involves an attack upon the sufficiency of the petition, which cannot be urged upon appeal for the first time.

ID.—CLAIM OF HEIRSHIP BASED UPON VOID SLAVE MARRIAGE—SONSHIP IMMATERIAL.—Where the conceded facts as to the claim of heirship show that it was based upon a marriage between slaves while

slavery was established in Missouri, which was void under the law of that state, as it then existed, for want of capacity in law of slaves to contract a valid marriage, a claim of heirship based thereon is untenable, notwithstanding the immaterial fact of sonship of such void marriage.

ID.—NATURE OF VALID MARRIAGE—CONTRACT—CIVIL STATUS—CONSENT FOR LIFE.—Marriage, under the law of Missouri, is not only "considered in law as a civil contract, to which the consent of parties capable of contracting is essential," which precluded the possibility of marriage between slaves, but it is also defined by the supreme court of Missouri, to be "the civil status of one man and one woman capable of contracting, united by contract and mutual consent for life, for the discharge to each other and to the community of the duties legally incumbent on those whose association is founded on the distinction of sex."

ID.—NATURE OF SLAVE MARRIAGE—TOLERATED CONCUBINAGE.—Considering the incompatibility of the duties of common marriage with those due from a slave to his master, and the inconsistency of a true marriage relation with the master's superior claims, as well as the general policy of slavery, there is no essential element that could give any sort of validity to such a union. It was tolerated concubinage, but not matrimonial cohabitation.

ID.—DISAFFIRMANCE OF SLAVE MARRIAGE—SEPARATION—SECOND MARRIAGE IN THIS STATE.—Where the slave marriage was never affirmed, after emancipation, but, before emancipation, the slave husband came to this state in 1859, and the slave wife moved to Texas and the former slave husband, after emancipation, contracted a valid marriage in this state, while the former slave wife was still living, the slave marriage was disaffirmed, and never had validity.

ID.—REBUTTAL OF PRESUMPTION OF MARRIAGE FROM COHABITATION AND REPUTE.—The second marriage in this state was sufficient to rebut any possible presumption of a former marriage from cohabitation and repute. The presumption of a marriage between A and B, founded simply upon habit and repute, is overcome by proof of a second actual marriage between A and C during the lifetime of B.

ID.—SUBSEQUENT LAW OF MISSOURI VALIDATING SLAVE MARRIAGES— STATUTE NOT PROVED.—A subsequent law of Missouri, passed in 1863, validating slave marriages and legitimating the children must be proved as a fact, like any other facts; and where it was not so proved, it cannot be considered.

APPEAL from an order of the Superior Court of Yolo County, denying partial distribution of the estate of a deceased person. E. E. Gaddis, Judge.

The facts are stated in the opinion of the court.

W. A. Gett, and A. C. Huston, for Appellants.

George Clark, W. A. Anderson, and A. G. Bailey, for Respondents.

CHIPMAN, P. J.—G. Wyatt Wheeler and John W. Wheeler filed their petition for a partial distribution of the above-entitled estate, claiming to be sons of Basil Campbell, deceased, by his wife, Mary Stephens, alleging that "the only other heir of said deceased is his surviving wife, Mary Jane Campbell"; it is also alleged that the last will of deceased has been lately admitted to probate and the said Mary Jane Campbell duly appointed executrix thereof. The petition was opposed by the executrix in her official capacity and by her individually and by Leonora Williams, devisee and legatee under said will, denying the averments of the petition.

The court found "that the said G. Wyatt Wheeler is not nor is the said John W. Wheeler, the offspring or child of any marriage whatever between the person known as Mary Campbell, also known as Mary Stephens. That the said G. Wyatt Wheeler is not nor is the said John W. Wheeler a son or heir at law of the said Basil Campbell, deceased; that neither of said petitioners is entitled to succeed to any part of the estate of said deceased." The petition was denied by the court and petitioners appeal from this order. The findings are challenged as unsupported by the evidence.

The will was not admitted in evidence, and respondent makes the preliminary point that the record does not show that petitioners are provided for in, or that they are omitted from, the will of Basil Campbell, deceased, "and this sufficiently justifies the finding that they are not entitled to share in the estate of the deceased; and this one finding, not overthrown, is all the support the order appealed from needs." The point is apparently an attack upon the sufficiency of the petition. There was no demurrer to it and no objection made to any of the testimony as not within the issues presented by the petition and answer. The cause was tried upon the theory that all the material issues were properly presented, with no objection from either party. The court

will not allow either party now for the first time to say that there was no issue. (*Carroll* v. *Briggs,* 138 Cal. 452, 454, [71 Pac. 501].)

Petitioners claim that they are the sons of deceased, Basil Campbell, born to Mary Stephens while his wife. Contestants dispute the marriage and also dispute the alleged parentage of the petitioners on the father's side. The controversy harks back to a period more than three score years ago, and is an echo of the old slave days.

It seems to us that the questions presented relate to the principles of law as established and applied to a condition of facts peculiar to the system of slavery, rather than to any controversy as to what the facts are. These principles, as we conceive them to have been settled, must control the case, and in them, we think, the judgment of the learned trial court finds support, although it be admitted that the principal facts, adduced by petitioners, are deemed to be true. We will state enough of the evidence to show the facts from which we are to determine whether or not, in legal contemplation, the relation of marriage ever existed between Basil Campbell and Mary Stephens.

Basil Campbell was born a slave about the year 1830 and belonged to Catherine Stephens, at Bunceton, Cooper county, Missouri; she purchased him, when he was a boy, from the Campbell estate, and he was thereafter known as Basil or Bas Stephens; Mary Stephens was also a slave and belonged to Catherine Stephens; her age is not very satisfactorily shown, but it appeared that she was probably twenty or twenty-five years older than Basil. From the deposition of William Wheeler, a witness for petitioners, it appeared that he was seventy-eight years old in 1908, which would make him about the same age as Basil; he was a "superannuated Methodist preacher." He testified: "Mary Stephens was my mother; she was a slave and went by the name of the people she belonged to; my father's name was Abraham Wheeler; Mary belonged to Catherine Stephens and Abraham Wheeler belonged to Ben Wheeler. . . . My father was Mary's first husband; have no knowledge where they were married. . . . I think my father died in 1880; my mother was married twice; I think my mother had six or seven children; my mother's eldest child was Lewis; he lived in Cooper county

and belonged to the same people I did; next child was Andy
and then Walsh; I don't know who was the father of Andy,
Lewis or Walsh; I think they were by different fathers; my
mother lived with Catherine Stephens and my father lived
with Ben Wheeler until he was sold; the Wheeler place is
distant two and one-half miles from the Stephens place.''
(It appeared that Abraham was sold to Judge Usher of Sheri-
dan county, Missouri.)    Other witnesses speak of Mary's
marriage to Abraham, which latter was probably what is
known as a ''slave marriage.''    The date of the alleged mar-
riage of Basil to Mary is not fixed definitely, but from all
the evidence it would appear to have taken place when he
was about eighteen years old and when Mary was probably
forty.    One witness for petitioners, an old colored woman,
Violet Glasgow, living near Bunceton, declared that ''Bas
and Mary were married right here below the mill by uncle
Rev. Bas Levins, a Baptist minister.''    On cross-examination
she testified: ''I wasn't present when Bas and Mary were
married; my father and mother were there; I know they
were married down there where I told you; I could not tell
you when they were married; it is so long ago; they told me
they were married. . . . My father and mother told me that
Basil and Mary were married and I knew when they went
to the wedding; I couldn't go; had to attend to the chil-
dren, but I got some of the wedding cake and sweet potatoes;
the Rev. Bas Levins was an old man; a colored man.''    No
witness, other than Violet Glasgow, referred to any ceremony
connected with the marriage of Bas and Mary, and the tes-
timony of this witness generally, in other particulars, indi-
cates that her memory was poor and her statements not to
be explicitly relied upon.    Other witnesses who testified that
Bas and Mary were married, witnesses familiar with the
Stephens household and in a position to know the facts, testi-
fied that ''they took up with each other,'' according to the
custom among slaves, lived together and cohabited and had
children, and were generally reputed to be man and wife,
and of these facts they predicated their marriage.

Mr. W. H. Stephens, a resident of Bunceton, a witness for
petitioners, deposed: That he knew Bas and Mary and the
two boys, John and Wyatt. ''I only knew of the relation-
ship of these four negroes from what I have heard the black

and white people of the neighborhood say, and Bas and Mary were considered by all of them as husband and wife in the way of the time. . . . Was there frequently between the time of the birth of John and Wyatt, and the time Bas went to California in 1854; they all lived at Grandmother Stephens' place; Mary took Bas' leaving quite hard.'' He was asked if Bas and Mary were husband and wife according to custom and answered: ''Well, it was regarded as near as any couple; some of them had a big wedding and some had a very private wedding and some had none. Some had no wedding. These three were common. This didn't belong to the big class or I would have heard about it.'' On cross-examination he was asked the custom among the slaves and answered: ''Some had big weddings, some private, some none—just took up with each other, so it was agreeable to the white folks, there was no objection; Bas and Mary just took up with each other, so far as I know.'' T. B. Stephens, a witness for petitioners, son of Catherine Stephens, seventy-five years old, residing near Bunceton, deposed: That he knew John and Wyatt Stephens and their mother Mary. ''Q. Who was the father? A. I could not say who their father was. Q. Who was their reputed father? A. Bas Campbell. Q. Did Bas and Mary live together on the place of your mother? A. Yes, they were together on the place. Q. What was the common understanding as to whether or not they were living together as man and wife? A. Well, that was the general understanding. Q. Your mother was living there on the place at the time? A. Yes. Q. Was this relationship known to her? A. Yes, I suppose it was. . . . Mary had five children before John and Wyatt were born; before Bas came to the place, cannot say Mary was ever married; a man visited her named Wheeler who she claimed to be her husband; . . . it was supposed that Bas and Mary were cohabiting all the time; . . . was not present when Bas and Mary were married; never heard of any ceremony; so far as I know Bas and Mary were simply living together on Mary's place, and Mary had two children during the time and Bas reputed to be their father; after Bas left in 1854, Mary never took up with any other man that I know of. . . . I think they slept together by the approval of my mother.''

Thomas S. Stephens, residing at Bunceton, seventy-four years old, who describes himself as a "retired capitalist," was a witness for petitioners. He deposed: "Was acquainted with Basil Campbell; I reckon I knew him when I knew anybody; knew him right here at my mother's home. . . . I went to California in 1853. Bas went to California in 1854; he went with John D. Stephens in taking cattle across; Basil was then a married man; his wife was called Mary Stephens (after her owner); she was known as Big Mary; Bas was married a long time before he left for California; he had two children named John W. Wheeler and Wyatt." He testified to having herded cattle with Bas near Knights Landing. "No one else was with us; during that time Basil talked with me about himself and his family in Missouri; . . . he said he wanted to make money enough to buy them and take them out there; . . . I knew Basil before 1844; I knew him before his marriage to Big Mary; . . . I suppose the marriage that occurred between Basil and Big Mary was recognized by Catherine Stephens; that was the custom of the country; I reckon they were married for the Stephenses did not allow them to live together until they were married." He described the houses where the negroes slept and the room that Bas and Mary lived in. "The custom was, that if one of a married couple went clean out of the country, they had a legal right to marry again; the custom was if a nigger was sold down south to go to the cotton fields and left his wife here, of course, she had the right to marry again and he could get a wife down there; but we never looked on Bas as leaving his wife to marry anybody else, because he was speaking about coming back here and taking her and his boys back; . . . unless a man was sent entirely out of the country, a marriage was supposed to continue between slaves; I can't tell you whether Mary was divorced or separated from Wheeler; there was no law from 1840 to the Civil War by which slaves were divorced. . . . Wheeler was sold out of the neighborhood; he was sold to a party living forty or fifty miles away; don't know whether he got a divorce; niggers didn't get divorces; he never came back." Jos Stephens, a witness for contestants, seventy-two years old, who came to California in 1854, and has lived here ever since, testified: "I have known Basil Campbell ever since

I have known anybody. I knew Basil Campbell back in Missouri ever since I have known anybody. . . . I knew Big Mary. She had five or six or seven children when Bas came to California. Never while in Missouri did I hear any talk among any people in the neighborhood, that Basil and Big Mary were married." J. S. Tutt, a witness at the trial for contestants, eighty-two years old, formerly living near Bunceton, testified that he knew Bas and Mary there. He was asked what he knew as to whether Bas was a single or married man and answered: "He was considered a single man, as far as I know." He testified that slave marriages were with the consent of the owners; that he knew nothing of Bas' marriage; "just my impression; I never heard of it." He was asked to explain "how a slave marriage would take place, or how one negro would get the privilege of being or staying with another." He answered: "Well, I don't know whether I can explain it exactly, Mr. Clark. In some instances they had their favorite girl or waiting-maid that waited on the girls, and they generally gave them a pretty elaborate wedding, you know, and ceremony and dancing; but as a rule, you know, the other class—field hands—what we called 'outsiders,' why if a man had a notion that he wanted to live with a woman as his wife, he would go to the master and ask his permission, and if he got it, that was all there was to it." He testified that it was the right of the master to separate the slaves after they were married and allow them to have intercourse with other slaves. He testified: "My conception of a slave marriage in those days was that it was almost a marriage of convenience than anything else. It was a certain custom, too, but the man generally had the privilege and exercised it a great deal, to quit whenever he felt like it." He testified that such intercourse as he had mentioned "was considered a slave marriage in the neighborhood," agreeable to custom there at that time. He also testified that "in order for a negro man to cohabit with a negro woman it was necessary to get the consent of the master," and that was considered a slave marriage "good in point of custom as long as it lasted." One or two other witnesses, who had known Bas and Mary in Missouri, testified that Bas' reputation was that of a single man.

It is undisputed that Basil came to California in 1854; that he never thereafter had any communication by letter or otherwise with Mary; that in 1861 she went to Texas and died there about 1887; that Basil was formally married in California to Rebecca Dolton in 1866, and, after her death, he married Mary Jane Campbell in 1893. It appeared without conflict that Mary's first slave marriage was with Abraham Wheeler, who was alive when Basil "took up" with Mary and did not die until 1880, and was never divorced from her.

There was evidence that Basil visited his old home in Missouri, in 1876, and then met John D. Wheeler, and that he, at that time spoke of both John and Wyatt as his sons. It did not appear that he made any reference to Mary as his wife, who, with Wyatt, was then living in Texas. He was then married to Rebecca Dolton and had been for ten years. In 1894 John wrote Basil a letter in which, among other things, he said: "I wrote you several letters since you was out here in 1876 and you didn't seem to recognize me as your son tho I always feel interested in you because I was always taught so by mother and all the white ones of the family." Basil made no reply nor had John W. heard from him after his visit in 1876. John was never in California.

Section 1387 of the Civil Code provides that: "The issue of all marriages null in law, or dissolved by divorce, are legitimate." The section also declares that "Every illegitimate child is an heir of the person who, in writing, signed in the presence of a competent witness, acknowledges himself to be the father of such child." No claim is here made that any such acknowledgment occurred. Nor is there any claim that Basil made such acknowledgment as is mentioned in section 230 of the Civil Code, as that section is interpreted in *Estate of De Laveaga*, 142 Cal. 158, [75 Pac. 790]. Subdivision 5 of section 1962, Code of Civil Procedure, provides that "the issue of a wife cohabiting with her husband, who is not impotent, is indisputably presumed to be legitimate." But this latter section presupposes a marriage. The only claim to the legitimacy of petitioners, therefore, having any standing in the case, must rest upon sufficient evidence that there was a marriage between Basil and Mary, and such acknowledgment by Basil of his paternity of petitioners as appears in the evidence must be viewed only as bearing upon

the question of his marriage to Mary, and not as in any sense tending to establish legitimacy by acknowledgment. The crux of the case is, Was there a marriage between Basil and Mary? If there was, in legal contemplation, a marriage, the presumption of legitimacy of their children follows (Civ. Code, sec. 193); and legitimacy of a child may be disputed "only by the husband or wife, or the descendants of both." (Civ. Code, sec. 195.)

In the case of *United States* v. *Roach* (decided in 1875), 92 U. S. 27 [23 L. ed., bottom of p. 597]), the action was against the United States to recover the value of certain cotton seized in 1863. The claimant, Hall, was a slave owned by Benjamin Roach, who filed an interpleader. Subsequently Roach died and his executrix was made a party. Hall claimed under a contract of purchase from his master. The court said: "In order to see the proposition in its true light, it is necessary, as it were, to roll back the tide of time, and to imagine ourselves in the presence of the circumstances by which the parties were surrounded when and where the contract is said to have been made. . . . The case must be determined as if slavery had not been abolished in Mississippi, and the laws referred to were still in force there. The destruction of the institution can have no effect upon the prior rights in question." Holding against Hall's contention, the court said: "It was an inflexible rule of the law of African slavery, wherever it existed, that the slave was incapable of entering into any contract, not excepting the contract of marriage. (Citing cases.) This regulation was harsher than that which obtained in regard to the Roman bondman, the Saxon villein, Russian serf, the German and Polish slave." (Citing Cobb on Slavery, sec. 266.) We derive but little aid from an examination of the decisions defining what may constitute a legal marriage, generally, between free men and free women capable of contracting. The statutory definition of marriage in the state of Missouri, as in our own state, precludes the possibility of a marriage between slaves. "Marriage is considered in law as a civil contract, to which the consent of parties capable in law of contracting is essential." In *State* v. *Bittick*, 103 Mo. 183, [23 Am. St. Rep. 869, 15 S. W. 325, 11 L. R. A. 587], the above is given as the statutory definition of marriage in that state. It is the same here.

(Civ. Code, sec. 55.)   In that case it was held, notwithstand-
ing the statutes regulating the marriage ceremony, requiring
license, etc., that a marriage according to the common law
was valid.   Speaking of the contract, the court said: ''While
it is here declared to be a civil contract, it is almost uni-
versally held to be something more than an ordinary contract.
Marriage is a status, created by contract, and we formulate
the definition of it as follows: Marriage is the civil status
of one man and one woman capable of contracting, united by
contract and mutual consent for life, for the discharge, to
each other and to the community, of the duties legally in-
cumbent on those whose association is founded on the dis-
tinction of the sex.   The contract of marriage in this case
comes up to every requirement of this definition.   It created
the relation of husband and wife between defendant and
Bertha, so long as they both should live.   In form, then, the
contract was good, and constituted a valid marriage at com-
mon law.   (1 Bishop on Marriage and Divorce, secs. 2, 3.)
This relation between them is indissoluble, except by death
or a decree of court.''   The court reached its conclusion with
some reluctance, but mainly because there were no words in
the act declaring marriage not in conformity to the statute
null and void.   In *Kilburn* v. *Kilburn,* 89 Cal. 50, [26 Am.
St. Rep. 447, 26 Pac. 637], marriage was defined as a con-
tract ''according to the form prescribed by the laws by which
a man and woman capable of entering into such a contract
mutually engage with each other to live their whole lives
together in the state of union which ought to exist between
a husband and his wife.''   Said the supreme court of the
United States in *Maynard* v. *Hill,* 125 U. S. 190, [8 Sup. Ct.
730] : ''It is a relation for life, and the parties cannot ter-
minate it at any shorter period by virtue of any contract
they may make.''

We might cite a multitude of cases to like effect.   Mr.
Schouler expresses the rule as universally held to be sound:
''The word 'marriage' signifies, in the first instance, that act
by which a man and woman unite for life, with the intent
to discharge toward society and one another those duties
which result from the relation of husband and wife.''
(Schouler on Domestic Relations, sec. 12.)   The relation here
shown, between Basil and Mary, falls far short of measuring

up to the requirements indispensable to a marriage. A relation which neither party has the capacity to create and which either party could terminate at will, or which could be terminated by their master, is not a marriage relation, and it is mockery to speak of it as such.

Nevertheless, there was a universal custom of marriage among slaves, as among white people, "but this custom was a thing separate and distinct from the law which governed the marriages of the free." (1 Bishop on Marriage and Divorce, sec. 654 [new commentaries].) The case of *Johnson* v. *Johnson*, 45 Mo. 595 (decided in 1870), is cited by appellants. The action was for divorce by the wife. Both parties were negroes. Defendant was formerly a slave in Virginia and whilst he lived there he married a negress, also a slave, by whom he had three children. His wife and children were sold to some person in Texas and his master took him to Mexico, from whence he was brought to St. Louis, Missouri. Later, in the year 1849, he married the plaintiff, then a free woman of color, and a year later he was emancipated by his master. Thereafter he continued to live and cohabit with plaintiff as his wife for about thirteen years, when she left him, and commenced this proceeding for a divorce. It was pointed out in the opinion that by common consent, and universal usage existing among slaves, they were permitted to select their husbands and wives, and were known and recognized as husband and wife by their masters and the community in which they lived; "but whatever moral force there may have been in such connections, it is evident there was nothing binding or obligatory in law." *Howard* v. *Howard*, 6 Jones (51 N. C.), 235, is cited, where it was said: "Marriage is based upon contract; consequently the relation of man and wife cannot exist among slaves. It is excluded both on account of their incapacity to contract, and by the paramount right of ownership in them as property." So also it was said, as is further pointed out: "The duties and rights which are deemed essential to this contract are necessarily incompatible with the nature of slavery, as the one cannot be discharged nor the other recognized without doing violence to the rights of the owner. In other words, the subject of the contract must cease to be slaves before the incidents inseparable to the relation of marriage, in its proper

sense, can attach." The court then, in the principal case, takes up the question whether slaves in a state of slavery could contract a marriage so as to be binding upon them after their emancipation. It was shown that the common law was changed in that state with reference to marriage, and the subject placed under municipal regulation. "But the authority of law was exclusively applicable to free persons, and did not reach those persons who were in a state of slavery when the marriage was contracted." In this view the court reverted to the common law and its analogous principles in the case before it. Said the court: "Though the slave could make no civil contract, and his marriage was absolutely void in legal contemplation, yet it is apparent there was the moral assent of the mind." Instancing the marriage of infants, and of insane persons, afterward held good when ratified or consummated, upon the removal of the disability, the court held that cohabitation and recognition of the relation *after emancipation,* was an assent to and confirmation of the contract. The court said: "If, *after the emancipation, there was no confirmation by cohabitation or otherwise,* it would be obvious there would be no grounds for holding the marriage as subsisting or binding." The court further said: "As the appellant, when he was emancipated, continued to live and cohabit with respondent and constantly acknowledged her as his wife, the marriage should be recognized and be deemed valid and binding. That in his earlier days he was previously married can make no difference. His first marriage in his then state of servitude had no legal existence; he was at liberty to repudiate it at pleasure; and by his continuing to live with respondent and acknowledging her as his lawful wife after he had obtained his civil rights, he disaffirmed his first marriage and ratified the second." This case seems to hold that had there been no subsequent ratification the court would have been forced to hold that there was no marriage.

The case of *Lee* v. *Lee,* 161 Mo. 52, [61 S. W. 630], is also cited by appellant. In that case, however, the legality of the slave marriage was not before the court, the question being as to the right of their children to inherit under the Revised Statutes of 1899. In the case of *Roche* v. *Washington,* 19 Ind. 53, [81 Am. Dec. 376], the controversy arose out

of the relation of a white man and an Indian woman. The stipulated facts showed a marriage according to Indian custom consummated by living and cohabiting together as husband and wife. Among other contentions it was urged that the marriage must be recognized under the law of nations, the Indian tribes being treated as states. Said the court: "What, then, constitutes the thing called a marriage? What is it in the eye of the *jus gentium?* It is the union of one man and one woman, 'so long as they shall both live,' to the exclusion of all others, by an obligation which, during that time, the parties cannot, of their own volition and act, dissolve, but which can be dissolved only by authority of the state. Nothing short of this is marriage. And nothing short of this is meant, when it is said that marriages, valid where made, will be upheld in other states." (Citing Story's Conflict of Laws, c. 5; Wheaton's Law of Nations, 137; *Reynolds* v. *Reynolds,* 3 Allen (Mass.), 605.) In *Estate of Hazzard,* 13 Phila. (Pa.) 335, it was held, where a marriage had taken place between testator and wife, who were slaves in Virginia, at a time when such marriages were permitted, but not recognized as a valid contract by that state, that the children of testator born in slavery were illegitimate, and must be so considered in Pennsylvania; that they could not have inherited from each other. The court said, that the marriage not being recognized by the law of Virginia, "we are bound to respect that law, however repugnant to the present condition of society or the law, either of Virginia or our own state." In volume 1, chapter XXI (sec. 646 et seq.), Mr. Bishop considers: 1. Slave marriages; 2. The effect of emancipation on these marriages; 3. The status and rights of the children. He points out that there were two, if not three, reasons for the legal doctrine which denies validity to slave marriages: First, that slaves had, in law, no such freedom of will as is required to pass the matrimonial consent; secondly, that the duties of the husband and wife are incompatible with the duty which the slave owes to his master; third, sometimes urged, that the slave's acquisitions accrued to the latter. The author expresses some doubt as to the sufficiency of the first and third reasons, although the cases seem to be against him; but, as to the second, he says: "That the duties of husband and wife are incompatible with those of a slave is a proposi-

tion evidently sound in law, and upon it the doctrine which denies to slaves the power of matrimony may well rest.'' He then deduces the doctrine that since for reasons stated these customary slave marriages were valid as far as in the nature of the case they could be—''they are deemed to have been, not null in the widest sense of the word, but only null as compared with ordinary marriages, and were good in law for any purpose for which they could so be held, not inconsistent with the master's superior claims or the general policy of slavery. This rule would seldom permit validity to be assigned them in every-day litigation of the courts; hence judges would naturally speak of them as void.'' It is difficult to perceive any purpose for which the marriage was held good except to distinguish the relation from that of fornication. When we consider the incompatibility of the duties of common marriage with those due from the slave to the master and the inconsistency of a true marriage relation with the master's superior claims as well as the general policy of slavery, there remains no essential element that could give any sort of validity to such a union. It was tolerated concubinage but not matrimonial cohabitation. What are some of the duties and reciprocal rights arising out of the sacred relation of husband and wife? Marriage necessarily supposes a home and mutual cohabitation; each has the right to the society of the other; and obligation rests upon both to live together—to adhere to each other so long as they shall live; the husband has the right to fix the domicile and the wife's domicile merges in that of the husband, and wherever he goes she is bound to go; each spouse is entitled to the society and affection of the other, and the husband may recover damages from any person who would withhold her from him, and may sue for damages all persons who seek to entice her away; the husband is bound to support his wife, and she may not leave him so long as she is comfortably provided for. Then there are the wife's obligation to render family services; the right of the father to the custody of the children. (Schouler on Domestic Relations, sec. 34 et seq.) These and others that might be mentioned are recognized rights, duties and responsibilities attending marriages among all civilized people, and yet not one of them attaches, as of right, to these so-called slave marriages.

12 Cal. App.—46

Mr. Story, in his work upon the Conflict of Laws, eighth edition, section 113, says: "The general principle certainly is, as we have seen, that between persons *sui juris,* marriage is to be decided by the law of the place where it is celebrated. (Note, sections 80, 81.) If valid there, it is valid everywhere. It has a legal ubiquity of obligation. If invalid there, it is invalid everywhere." This rule was quoted approvingly in *Pearson* v. *Pearson,* 51 Cal. 120; *State* v. *Kennedy,* 76 N. C. 251, [22 Am. Rep. 683]; *Estate of Hazzard,* 13 Phila. (Pa.) 335. Mr. Bishop says: "It is necessary that there should be one universal rule whereby to determine whether parties are to be regarded as married or not; and that the only practicable rule is to refer this question to the law of the country wherein they exchange the mutual consent to be husband and wife." Our Civil Code, section 1646, lays down the rule: "A contract is to be interpreted according to the law and usage of the place where it is to be performed; or if it does not indicate a place of performance, according to the law or usage of the place where it is made."

Without prolonging a discussion, the present length of which is justified only by the importance of the questions and the apparent sincerity, zeal and earnestness of appellants' counsel in urging their contentions, we find no great difficulty in reaching the conclusion that no marriage was proven ever to have taken place between Basil Campbell and Mary Stephens. When Basil and Mary "took up with each other," having their mistress' consent, they knew that the relation was but temporary; that they had no power to perpetuate it; that they could be permanently separated any moment, either by their own act or that of their mistress; that Mary had a slave husband then living, two or three of whose children were in the family. Basil left Missouri, not to return, in 1854, and though he may have then had in mind the thought of bringing Mary and the children to him some day, he took no steps to that end; he married in this state in 1866 while Mary was living; ceased all communication with Mary in 1854, who not long thereafter went to Texas and there died; he never communicated with her in any way after leaving Missouri, and indicated by his marriage here a renunciation of any relation with her—in short, the entire conduct of both

parties is consistent with their acceptance of the fact that their former relation was not that of husband and wife. If it be insisted that a presumption of marriage arose from cohabitation and repute, this presumption is removed by proof of Basil's formal and lawful marriage in this state. (*Case* v. *Case,* 17 Cal. 598.) It was held in *Jones* v. *Jones,* 48 Md. 391, [30 Am. Rep. 466]: "The presumption of a marriage between A and B, founded simply upon habit and repute, is overcome by proof of a subsequent actual marriage between A and C during the lifetime of B."

We do not find it necessary to dwell upon the effect which emancipation had upon these so-called slave marriages. Mr. Bishop states the doctrine as now settled: "That though during slavery the slave marriage is substantially void in law, if after emancipation the parties continue to cohabit matrimonially, it is thereby made good." And so, it was held in *Johnson* v. *Johnson,* 45 Mo. 595, where a slave had two wives, and after emancipation he continued to live with the second one, and acknowledged her as his lawful wife, he not only ratified the second slave marriage, but disaffirmed the first.

It is said that a statute passed by the Missouri legislature in 1865 validated the marriage and legitimatized the children. But no such statute is in evidence. The laws of another state must be proved like any other fact. (*Estate of Harrington,* 140 Cal. 244, [98 Am. St. Rep. 51, 73 Pac. 1000]; *Estate of Richards,* 133 Cal. 524, [65 Pac. 1034].)

As already pointed out in the earlier part of this opinion, the legitimacy and right of appellants to inherit depend upon a marriage being proven; and, as we conclude that there was no marriage shown, the finding of the court is sustained.

The finding that neither of the petitioners is a son of deceased is immaterial, for in view of the other findings, neither of them is entitled to inherit, although both may be sons of deceased.

The order is affirmed.

Burnett, J., and Hart, J., concurred.

A petition for a rehearing and a petition for a modification of the judgment of this cause was denied by the district court of appeal on April 4, 1910, and a petition to have the cause heard in the supreme court, after judgment in the district

court of appeal, was denied by the supreme court on May 6, 1910. Shaw, J., dissented from the order denying a rehearing by the supreme court, and on May 7, 1910, filed the following opinion thereon:

SHAW, J.—I dissent from the denial of the application to vacate the judgment of the district court of appeal in this cause. I do not think that the decisions holding that a marriage contracted in good faith between slaves is not a marriage at all should be followed. And if it were conceded that such a marriage is technically null on the ground that the parties were slaves without capacity to contract, under the decisions of the courts of the slave states made during the existence of that condition, nevertheless the children born of such a marriage should be considered as legitimate under our statute. Section 1387 of the Civil Code declares that "The issue of all marriages null in law, or dissolved by divorce, are legitimate." There being no evidence in the record as to the law of Missouri where the marriage of the deceased with the mother of the petitioners took place and where they were born of that marriage, it is to be assumed that the law of that state is the same as our own. If ever there was a law which should be broadly and liberally construed, it must be admitted that this law is of that class when applied to a marriage which, in all respects except the capacity to enter into it, was as formally solemnized and as faithfully observed as that of free persons. I can conceive of no sound reason for refusing to apply this statute to the children of a marriage which is null only because the man and woman who entered into the relation were slaves. The question is of little future importance, but I cannot allow a doctrine which I deem so repugnant to humanity to receive even the silent sanction of acquiescence without a protest. I think it proper to add that the denial of a rehearing in this court does not necessarily mean an approval of the opinion of the district court. (*People* v. *Davis*, 147 Cal. 350, [81 Pac. 718].)