STATE v. ALBERT SOYKA.[1]

November 28, 1930.

No. 28,054.

*Keller, Broady & Chapin,* for appellant.

*C. D. O'Brien, Jr.* County Attorney, and *Edward T. Diehl,* Assistant County Attorney, for the state.

STONE, J.

This is a filiation proceeding wherein, a jury having found defendant guilty of being the father of an illegitimate child, he appeals from the order denying his motion for a new trial.

Conception took place on or about March 17, 1929. The mother and complaining witness was then married but living apart from her husband. October 14, 1929, he procured a divorce from her in an action commenced the preceding April. Both the mother and her former husband testified that they had no intercourse, sexual or otherwise, during a long period before and after the time when the child must have been conceived. Defendant's denials of parentage are refuted among other things by evidence that when pregnancy

[1]Reported in 233 N. W. 300.

became apparent and the expectant mother charged him with having caused her condition he contributed $100 for her "expenses and * * * hospital bill." The evidence is such that the jury might well have concluded that defendant and complaining witness were living in concubinage when the child was conceived. Making such argument as they may against that view of the record, counsel for defendant frankly put their case, at last, upon the presumption of the legitimacy of any child conceived in wedlock.

■ The presumption thus invoked is either conclusive or not; and, if the latter, the question becomes one of fact to be solved by evidence in the ordinary fashion. There was a time when, under the common law of England, the presumption was as a practical matter almost impossible of being overcome. The cases are reviewed and the evolution of the rule developed in the annotation of In re Estate of McNamara, 181 Cal. 82, 183 P. 552, in 7 A. L. R. 313, 329. It is there made plain that, as stated by another authority (3 R. C. L. 728) the great weight of authority is "that access, that is an opportunity for sexual intercourse, need not be shown to have been impossible, and that where an opportunity for sexual intercourse is shown, the presumption favoring legitimacy, while very strong, is not conclusive, and may be rebutted by showing that intercourse did not in fact take place."

We adopt that view and hold that in this case the presumption was sufficiently overcome. That the husband and wife during their separation, and at the time of the conception of the child found illegitimate, were living in the same city, possibly in houses in the same block, and occasionally saw each other, may suggest the possibility of access. But it does not go to the extent of making the presumption controlling as against the positive testimony of husband and wife to nonaccess during the determinative period. That testimony is so much corroborated by obvious implications from the story of defendant himself that it would be the height of absurdity to make controlling any arbitrary rule to the contrary. The presumption of legitimacy, while in other days it may sometimes have had that effect, should no longer be applied when the only result

will be to exculpate the guilty paramour at the expense·of the wronged husband rather than to immunize the child from the bar sinister. The latter purpose was the only real justification the practically conclusive presumption ever had.

■ There remains the much mooted question as to the competency of husband and wife to testify in such a case to nonaccess. There is much authority, English and American, for the proposition that "nonaccess cannot be proved by either the husband or the wife, whether the action be civil or criminal, or whether the proceeding is one of settlement or bastardy, or to recover property claimed as heir at law." 3 R. C. L. 732. That doctrine goes back to the supposed rule arbitrarily announced in 1734 by Lord Hardwicke in The King v. Reading, Hardw. 79, 83, that in a filiation proceeding the sole evidence of the married mother was not sufficient "to bastardize her child, and to discharge her husband of the burthen of his maintenance." With equal independence of precedent, Lord Mansfield 43 years later in Goodright v. Moss, 2 Cowp. 591, 592, 11 Eng. Ruling Cas. 518, 520, declared the law of England to be "clear that the declarations of a father or mother cannot be admitted to bastardize the issue born after marriage."

We may assume that we took over that rule with our adoption of the common law of England. If that be so, the rule has been changed by statute. "Any woman who is delivered of an illegitimate child, or pregnant with a child which, if born alive, might be illegitimate" may institute the statutory filiation proceeding (G. S. 1923 [1 Mason, 1927] § 3261). Such a proceeding is within G. S. 1923 (2 Mason, 1927) § 9814, making competent to testify in "any action or proceeding, civil or criminal, in court or before any person who has authority to receive evidence," every person of sufficient understanding, including the parties. Married persons necessarily are included. That would be clear even if the statute omitted its express provision that neither spouse can be examined for or against the other without the latter's consent during the marriage or afterwards. The exclusion from that exception of civil or criminal proceedings by one spouse against the other, criminal actions or proceedings for crimes committed by one against the

other, and an action or proceeding for abandonment and neglect of the wife or child by the husband makes the legislative intent clearer still. The legislature gave special attention to the question of the competency as witnesses of married persons, and there is no possibility of concluding that it was not the intention to abrogate, among other things, the common law rule rendering parents incompetent to testify to the illegitimacy of a child born to the mother during wedlock.

Dean Wigmore has made a very destructive analysis of the "dogmatic" pronouncements of the English rule. He refers to the decencies and moralities invoked in its support as "mere pharisaical afterthoughts, invented to explain an otherwise incomprehensible rule, and having no support in the established facts and policies of our law. There never was any true precedent for the rule," he continues, "and there is just as little reason of policy to maintain it." 4 Wigmore, Ev. (2 ed.) §§ 2063, 2064. The statute above referred to is enough to show that long ago our legislature declared that it should not be maintained in this state.

Order affirmed.

WILSON, C. J. took no part.