The finding by the trial court that James Thomas Wray was the father of the plaintiff is in accord with the rules of the early common law and the Lord Mansfield rule, but is contrary to principles of modern law, and to the statutes of Montana as is hereinafter shown.
The rule of the common law of England, was "that if a wife had issue while her husband was within the four seas, that is, within the jurisdiction of the King of England, such issue was conclusively presumed to be legitimate, except on proof of the husband's impotence; and even if he was beyond the four seas he must have been away for so long a period before the birth of the child as to make it a natural impossibility that he could be the father." That was followed by a pronouncement by Lord Mansfield in 1777 that the law was that "neither husband nor wife would be permitted, as a witness, to bastardize the issue of the wife after marriage by testifying to nonaccess by the husband." The absurdities of some of the common-law rules are pointed out in the notes in 7 A.L.R. 329, where it is shown that some of the early judicial pronouncements went to extreme lengths in the interest of modesty and because of a reluctance to injure reputation; also in 4 Wigmore on Evidence, 2d ed., secs. 2063 and 2064.
Even in states where the Lord Mansfield rule may have been followed, evidence of the declarations in question would not come within the inhibition of that rule, because that rule operates only to prohibit evidence of declarations by a spouse relative to access or nonaccess by the husband, and does not prohibit either spouse from giving testimony "to show the offspring to have been begotten by a third person." (Wallace v. Wallace,137 Iowa, 37, 114 N.W. 527, 126 Am. St. Rep. 253, 15 Ann. Cas. 761, 14 L.R.A. (n.s.) 544; In re Gird's Estate, 157 Cal. 534,108 P. 499, 137 Am. St. Rep. 131.)
"The presumption that a child born in wedlock is legitimate is rebutted by satisfactory proof that the husband was absent *Page 528 
during the entire period in which the child must have been begotten." (7 A.L.R. 350; see, also, State v. Soyka,181 Minn. 533, 233 N.W. 300; Gower v. State, 155 Tenn. 138,290 S.W. 978; Mims v. State, 43 Ga. App. 100, 157 S.E. 901;Wilson v. Wilson, 174 Ky. 771, 193 S.W. 7.)
Section 5852, Revised Codes 1921, provides: "A child born before wedlock becomes legitimate by the subsequent marriage of the parents." The effect of this statute was, according to all late authority, to fully legitimate the plaintiff "for all purposes," and to place her on the same footing as though she had been born in lawful wedlock. This is true even though at the time of the birth of the illegitimate child the mother had a husband then living. (Allison v. Bryan, 21 Okla. 557, 97 P. 282, 17 Ann. Cas. 468, 18 L.R.A. (n.s.) 931; Bates v. Meade, 174 Ky. 545,192 S.W. 666; Busby v. Self, 284 Mo. 206, 223 S.W. 729;Stewart v. Stewart, 195 N.C. 476, 142 S.E. 577; In reDexheimer's Estate, 197 Wis. 145, 221 N.W. 737; Brisbin v.Huntington, 128 Iowa, 166, 103 N.W. 144, 5 Ann. Cas. 931; Inre Sheffer's Will, 139 Misc. Rep. 519, 249 N.Y. Supp. 102;Blythe v. Ayres, 96 Cal. 532, 31 P. 915, 19 L.R.A. 40;Kotzke v. Kotzke's Estate, 205 Mich. 184, 171 N.W. 442;Castor v. McDole, 80 Ind. App. 556, 148 N.E. 643; Wolf v.Gall, 32 Cal.App. 286, 163 P. 346, 350; Wilson v. Going,87 Okla. 265, 210 P. 1014; Jameson v. Jameson, 111 Okla. 82,238 P. 426; Drake v. Milton Hospital Assn., 266 Mo. 1,178 S.W. 462; 3 R.C.L. 739, 740; 7 C.J. 951-953.)
Citing, inter alia: In re Mills' Estate, 137 Cal. 298,70 P. 91, 93, 92 Am. St. Rep. 175; Blythe v. Ayres, 96 Cal. 532,31 P. 915, 19 L.R.A. 40; Holloway v. McCormick,41 Okla. 1, 136 P. 1111, 50 L.R.A. (n.s.) 536; In re Thompson,77 Mont. 466, 251 P. 163; Powell v. State, etc., 84 Ohio St. 165,95 N.E. 660, 36 L.R.A. (n.s.) 255; In re Walker's Estate,176 Cal. 402, 168 P. 689; Brisbin v. Huntington et al.,128 Iowa, 166, 103 N.W. 144, 5 Ann. Cas. 931; Mink v. State, *Page 529 60 Wis. 583, 19 N.W. 445, 446, 50 Am. Rep. 386; Watts v. Owens,62 Wis. 512, 22 N.W. 720, 723; State v. Romaine, 59 Iowa, 46,11 N.W. 721; Bethany Hospital Co. v. Hale, 64 Kan. 367,67 P. 848; Bell v. Territory, 8 Okla. 75, 56 P. 853, 855;Orthwein v. Thomas, 127 Ill. 554, 21 N.E. 430, 11 Am. St. Rep. 159, 4 L.R.A. 434, 437; Goss v. Froman, 89 Ky. 318,12 S.W. 387, 8 L.R.A. 102, 106; Jackson et al. v. Thornton,133 Tenn. 36, 179 S.W. 384; 1 Jones' Commentaries on Evidence, secs. 64, 70; 8 Ency. of Evidence, 170, 171; 3 Nichols on Applied Evidence, 2825 et seq.; 5 Wigmore on Evidence, sec. 2527.
Appellant cites section 5852, Revised Codes 1921: "A child born before wedlock becomes legitimate by the subsequent marriage of its parents." The statute undoubtedly contemplates an unmarried woman. The plaintiff was not born "before" but during wedlock. The statute may not be used to prove issue illegitimate which is presumed to be legitimate. That was never the intention of the legislature when it enacted the above provision. (Sams
v. Sams' Admr., 85 Ky. 396, 3 S.W. 593; Hall v. Hall, 26 Ky. Law Rep. 610, 82 S.W. 300; Kealoha v. Castle,210 U.S. 149, 28 Sup. Ct. Rep. 684, 52 L.Ed. 998.)
Since plaintiff was born while James Thomas Wray was the lawful husband of her mother the plaintiff will not be permitted to say that she is not his daughter. (7 C.J. 953.) A person born in marriage cannot be permitted by declarations or admissions to repudiate his own legitimacy. (Eloi v. Mader, 1 Rob. (La.) 581, 38 Am. Dec. 192; In re Madalina, 174 Cal. 693,164 P. 348, 1 A.L.R. 1629, 1632; In re Campbell's Estate, 12 Cal.App. 707,108 P. 669, 672; 13 Cal. Jur. 926.)
This proceeding was brought by Ruth Parker to determine heirship in the matter of the estate of Samuel L. Wray, deceased. She claims to be the daughter of the decedent, although when she was born her mother, Lydia Wray, was the wife of James Thomas Wray, an elder brother of Samuel. *Page 530 
Later on, as we shall see, Lydia married Samuel. From a judgment of the trial court holding that James and not Samuel was her father, she has appealed.
James and Samuel were members of a family of eight children. Two of their sisters, Mrs. L.W. Drew and Mrs. Victoria Cutler, come into view in the consideration of this cause. Samuel died in Butte on August 16, 1929, leaving an estate consisting of real and personal property of the value of approximately $13,500, the most of which came to him from the estate of Mrs. Drew, a widow without children, who died in Butte in 1928. In addition to his own share in the Drew estate, Samuel was entitled by assignment to the share of Mrs. Cutler. Upon the death of Samuel, his widow, Lydia, was entitled to one-half of his estate; the question is where the other half should go. If appellant's position is correct, she is entitled to it.
In 1890 James and Lydia, his wife, were living upon a farm near Hay Center, Nebraska. In that year, at his brother's invitation, Samuel came to live with the family. There is testimony tending to show that after the advent of Samuel, and certainly as early as 1892, James observed a friendship between his wife and brother, which caused him to remove from the farm and to establish a home for himself and his two eldest children, David and Mabel, at Culbertson, Nebraska, some forty miles distant, after which he did not live with his wife. The two younger children, Grace and Mary, remained with their mother, who continued to live at the farm. Samuel lived there too. James was engaged in the stock business, buying and shipping cattle, horses and hogs. He traveled extensively through Colorado, Kansas, New Mexico and Texas, and during the years 1892 and 1893 was away from the farm continually; if he was there at all during this period, his visits were fleeting ones. The evidence indicates that eventually James and Lydia were divorced. He married again and became the father of two children by his second wife. He died in 1915. *Page 531 
Appellant was born on the farm September 8, 1893. From birth she lived there with her mother, two sisters (or half-sisters), Grace and Mary, and Samuel, until 1905 when the family moved to a ranch near Box Elder, Nebraska; they lived upon the latter farm until 1909. Samuel went to Hyattville, Wyoming, in 1907 or 1908, but returned to Nebraska and married Lydia on October 28, 1909. Thereupon he and his wife went to Hyattville, and it would seem that they lived there almost to the end.
When Samuel and Lydia married, appellant was sixteen years of age. During her childhood Samuel provided for her support and maintenance. In the fall of 1909 he sent her to a school in McCook, Nebraska, and paid her expenses. On the other hand, James never contributed anything to her, nor did he ever write to or otherwise communicate with her. Indeed, she saw him but once — when she was eight years old — prior to Christmas of 1909, when during the holiday season she visited her aunt Victoria Cutler and James in Kansas City, Kansas, where they maintained homes. During that visit, she testified, James, to whom she referred as her uncle, told her that she was not his daughter; he related the circumstances attending her creation; told her of his long absences, and said when he returned home late in the spring of 1893 and discovered her mother in a family way he knew positively that because of the length of time he had been gone it was impossible for him to have been responsible for her condition; he placed the blame on Samuel.
When appellant was twelve years of age, Samuel told her that he and not James was her father. He asked her if she knew it, and she told him that she did; that her sisters had told her so. He suggested that she talk to her mother about it, which she did, and her mother confirmed what Samuel had said; her mother said that she and James had been separated, possibly a year or two, before her birth.
David Wray, her brother (or half-brother), testified at length as to the business activities and whereabouts of his father, James, during the years 1892 and 1893. He knew that his *Page 532 
father and mother were separated, but did not know the cause of it. He knew of his own knowledge that continuously during the years of 1892 and 1893 his mother and Samuel were living together on the farm; his father did not visit the farm from about the 1st of August, 1892, until about April 1, 1893. About the time appellant was born, his father told him that Samuel was her father. He heard his father say that on several occasions, and in 1905 he received a letter from his father in which reference was made to the fact that Ruth was not his father's child.
By deposition Victoria Cutler testified to her knowledge of family relationships. Her brother James, to whom she referred as Tom, told her a week or two before his death that Samuel, and not he, was the father of appellant. "He told me that several times when he lay sick in Bethany Hospital; and the last time he made that statement was after the doctors had told him in my presence he could not live. He said then that he did not expect to live." She said: "My brother Samuel asked me if I knew that Ruth was his daughter, and I told him that brother Tom had told me; my brother Samuel told me that was the fact, that Ruth Parker was his daughter."
Mrs. Cutler went to Butte in May, 1928, to attend the funeral of her sister, Mrs. Drew, and was there again in May, 1930. On May 27, 1928, by an assignment in writing she conveyed all her interest in the Drew estate to Samuel and told him in substance that she wanted him to have the use of it, and if he did not use it, it was to go to appellant. Samuel said at that time that he would make a will as soon as he got Mrs. Drew's estate settled so that he would know what he had to put in the will.
Thomas M. McKinney, an attorney at law of Basin, Wyoming, testified that in November, 1929, Lydia Wray called at his office and requested him to prepare an affidavit, which he did, and the document was offered in evidence. Therein she swore that during the time she was married to James, Ruth was born but her father was not James, but Samuel, whom she (Lydia) later married; that after Ruth had reached the age of *Page 533 
understanding, both her father, Samuel L. Wray, and affiant, her mother, informed her concerning her parentage; that of her own knowledge Samuel during his lifetime regarded Ruth as his daughter. Mr. McKinney testified further that Mrs. Wray told him that after Samuel came to live at the home of her husband they formed an attachment for each other, and that her husband left her and was gone for some two years. While he was gone she and Samuel became intimate and lived together as husband and wife, resulting in her pregnancy and the birth of Ruth.
After the holidays in 1909 appellant concluded the visit with her Kansas City relatives and went to the residence of her aunt, Mrs. Drew, in Nebraska, with whom she visited until 1910, when appellant married and went to live in Salt Lake City. Two boys were born to her.
In July, 1923, at the request of Samuel and Lydia, to whom she referred as her father and mother, she visited them at Hyattville, taking with her the two boys, and remained there until some time in 1924. Samuel then owned a ranch near Hyattville; he was also a director of the Basin State Bank at Basin, Wyoming. He treated her and the boys as his daughter and grandchildren. "That is the way he considered us and called us." He lavished presents upon the boys. He sent money to appellant regularly for birthday and Christmas. "I don't think he ever missed a birthday or Christmas," she said.
In response to a telegram she went to Butte at the time of Samuel's last illness, arriving there after his death. None of the other relatives was in Butte at that time, nor was any of them at the funeral.
None of the foregoing testimony was contradicted. There was introduced in evidence a power of attorney executed by appellant on August 20, 1929, which was acknowledged before the clerk of the district court of Big Horn county, Wyoming. This document was entitled, "In the Matter of the Estate of Mrs. L.W. Drew, also known as Mrs. L. Wray." Therein appellant recited that whereas "the above deceased died in *Page 534 
Silver Bow county on the 7th day of May, 1928, and the undersigned, Mrs. Ruth Parker of Hyattville, Wyoming, Being informed and believing that she is one of the heirs at law of the said deceased by virtue of the fact that she is a niece," she therefore appointed R.F. Gaines, of Butte, Montana, and Thomas M. McKinney, of Basin, Wyoming, her attorneys-in-fact to represent her in the matter of the estate.
It is argued by counsel for the respondents that the execution of this power of attorney refutes the claim that she is the daughter of Samuel L. Wray. It is said that if Samuel L. Wray was her father, he was the heir of Mrs. Drew but appellant was not; but if she were the daughter of James, then deceased, she was an heir of Mrs. Drew. Appellant said she did not read the instrument and did not know its contents. She thought she was giving her attorneys-in-fact power to act for her in Samuel L. Wray's estate. Her father was then dead; had passed away four days before. She denied that she consulted Mr. McKinney with reference to the Drew estate.
Victoria Cutler filed in this proceeding a statement in writing in which she said that she did not wish "to offer any opposition to the contention of Mrs. Parker in this matter, that she is the daughter of Samuel L. Wray and Lydia Wray and entitled to inherit as such." Cato Wray, Gilbert Wray and Paul N. Wray, surviving children of John W. Wray, deceased (John W. Wray was a brother of James and Samuel), filed a statement to the same effect; and David R. Wray, a surviving son of James, filed a statement expressing his desire that no contest be made in his behalf against the petition of appellant.
At the conclusion of the testimony the court found that Ruth Parker was the daughter of James Thomas Wray and not the daughter of Samuel L. Wray.
It is believed that the learned trial judge in finding against the appellant was motived by the presumptions to be noted presently, and that he opined the declarations of James Thomas Wray, Samuel L. Wray and Lydia Wray, which were admitted in evidence over objection could not legally be received in so *Page 535 
far as such declarations tend to show that appellant was begotten in adultery.
Section 10605, Revised Codes, 1921, declares: "The following presumptions, and no others, are deemed conclusive: * * * 5. The issue of a wife cohabiting with her husband, who is not impotent, is indisputably presumed to be legitimate."
Section 10606: "All other presumptions are satisfactory, if uncontradicted. They are denominated disputable presumptions, and may be controverted by other evidence. The following are of that kind: * * * 31. That a child born in lawful wedlock, there being no divorce from bed and board, is legitimate."
Section 5830: "All children born in wedlock are presumed to be legitimate."
A disputable presumption, says the statute, may be[1-3] controverted by other evidence. It is successfully controverted when proof to the contrary satisfactorily overcomes it. By proof which satisfactorily overcomes it, is meant that which sustains the affirmative of the issue — a preponderance of the evidence. In this jurisdiction civil cases are to be decided according to the greater weight of the evidence, and a bare preponderance in favor of the party holding the affirmative of the issue is sufficient to warrant, and should result in, a decision in his favor. (Gehlert v. Quinn, 35 Mont. 451,90 P. 168, 119 Am. St. Rep. 864; Parchen v. Chessman, 53 Mont. 430,160 P. 531.) Therefore, when the evidence preponderates against a disputable presumption, it "fades away in the face of contrary facts." (Welch v. All Persons, 85 Mont. 114,278 P. 110, 115; Nichols v. New York Life Ins. Co., 88 Mont. 132,292 P. 253.)
The declarations of the Wrays, if properly admitted, supported by other facts and circumstances, more or less cogent, appearing in the testimony, overwhelm the presumptions declared in sections 5830 and 10606, subdivision 31, supra.
The conclusive presumption (section 10605, subd. 5) applies only to the issue of a wife cohabiting with her husband. *Page 536 
"Cohabiting" implies that the husband and wife are living together and occupying the same house. (Bouvier's Law Dictionary.) It means "to live or dwell together, to have the same habitation, so that where one lives and dwells there does the other live and dwell also." (Quoted in O'Malley v.O'Malley, 46 Mont. 549, 129 P. 501, 503, Ann. Cas. 1914B, 662.) "Cohabitation is not a sojourn, nor a habit of visiting, nor even remaining with for a time; the term implies continuity." (11 C.J. 953.)
The proof is that James and Lydia were not cohabiting when[4] Ruth was begotten, nor had they been for many months; James did not live at the home of his wife; a separation had occurred and they were living apart. It does not follow, however, that, access not being shown, sexual intercourse between husband and wife did not occur. This brings us to a question upon which the courts are divided, with the weight of authority against permitting either husband or wife to testify as to the nonaccess of the husband. (3 R.C.L. 732; Jones, Commentaries on Evidence, 2d ed., sec. 2154.)
This doctrine has its foundation in an expression of Lord Mansfield, in Goodright v. Moss, 2 Cowp. 521, 11 Eng. Rul. Cas. 518; Dean Wigmore denounces it with his characteristic vigor. He condemns it as illogical; says there was never any true precedent for it, and that "there is just as little reason of policy to maintain it." (Wigmore on Evidence, 2d ed., secs. 2063, 2064.) The element of policy seems to be the mainstay of the doctrine. Whether the rule has a sound foundation need not concern us; nor are we troubled with the policy which should be adopted in this state, as we think our statutes control the matter.
We have seen that the conclusive presumption (sec. 10605, subd. 5) applies only when the parents have been cohabiting during the period of conception, and that the presumptions as to the legitimacy of children born in wedlock are disputable. Section 5832, Revised Codes, 1921, provides that: "The presumptions of legitimacy can be disputed only by the husband *Page 537 
or wife, or the descendant of one or both of them. Illegitimacy, in such case, may be proved like any other fact." This section clearly makes the husband, the wife, and the descendant of one or both of them competent to testify as to the presumption of legitimacy (except as to the conclusive presumption declared by subdivision 5 of section 10605); moreover, it provides that "illegitimacy, in such case, may be proved like any other fact." We find no other inhibition against husband or wife testifying in such case. Section 10534, Revised Codes of 1921, expressly provides that "all persons, without exception, otherwise than is specified in the next two sections" — which have no application to the precise point — "who, having organs of sense, can perceive, and, perceiving, can make known their perceptions to others, may be witnesses." (See In re McNamara's Estate,181 Cal. 82, 183 P. 552, 7 A.L.R. 313.) By the enactment of section 5832 our legislature abrogated the common law — or better say, the Mansfield — rule. Upon a consideration of statutes similar to our own, the supreme court of North Dakota so held in State v.Fury, 53 N.D. 333, 205 N.W. 877. (And see State v. Soyka,181 Minn. 533, 233 N.W. 300; Lynch v. Rosenberger,121 Kan. 601, 249 P. 682, 60 A.L.R. 376.)
Subdivision 4 of section 10531, Revised Codes of 1921,[5, 6] provides that evidence may be given upon a trial of "the act or declaration, verbal or written, of a deceased person in respect to the relationship, birth, marriage, or death of any person related by blood or marriage to such deceased person." This is a recognition of the rule that hearsay testimony is admissible in matters of genealogy or, as it is sometimes characterized, in questions of pedigree. (Welch v. AllPersons, 85 Mont. 114, 278 P. 110, 114.) "Pedigree is the history of family descent, which is transmitted from one generation to another by oral and written declarations and by tradition. Unless proved by hearsay evidence, not competent in general issues, it cannot in most instances be proved at all. Therefore, proof of pedigree may consist of proof of descent and relationship *Page 538 
evidenced by declarations concerning particular facts, such as births, marriages and deaths. In such cases hearsay evidence of declarations of persons who, from their situation, were likely to know the fact, is admissible, provided the person making the declaration is dead or unavailable." (Jones, Commentaries on Evidence, 2d ed., pp. 2079, 2080.)
The declarations of deceased persons or putative parents as to the legitimacy or illegitimacy of their alleged children are admissible. (Jones, Id., p. 2091; Geisler v. Geisler,160 Minn. 463, 200 N.W. 742; Kotzke v. Kotzke's Estate, 205 Mich. 184,171 N.W. 442.)
In an action involving the legitimacy of a child, declarations by the mother's deceased paramour that he was the child's father are admissible to show legitimation, if declarations by a deceased regarding persons related to him constitute competent evidence. (3 Nichols on Applied Evidence, p. 2849; In reMcNamara's Estate, supra; and see In re Heaton's Estate,139 Cal. 237, 73 P. 186; Smith v. Smith, 140 Wis. 599,123 N.W. 146.)
In In re Colbert's Estate, 51 Mont. 455, 153 P. 1022, this court said that under the express provisions of section 7887, Revised Codes, 1907, now section 10531, supra, a declaration of relationship made by a decedent is admissible under the section which is now section 10513, Revised Codes, 1921, to determine the right to the estate of such decedent. (Welch v. All Persons, supra.)
We hold that the declarations of James, Samuel and Lydia were admissible in evidence. The mere possibility that James might have visited Lydia during the period when conception took place is not enough to overcome the testimony to the contrary.
An interesting discussion on this subject is that of Mr. Chief Judge Cardoza, in Re Findlay, 253 N.Y. 1, 170 N.E. 471, 473: "At times the cases seemed to say that any possibility of access, no matter how violently improbable, would leave the presumption active as against neutralizing proof. *Page 539 
(Rex v. Luffe, [8 East, 193], supra, per Lord Ellenborough;Head v. Head, 1 Sim. S. 150.) A formula so inexorable has yielded with the years to one more natural and supple. There are survivals here and there of the rule of olden days. (Cf. Powell
v. State ex rel. Fowler, 84 Ohio St. 165, 95 N.E. 660, 36 L.R.A. (n.s.) 255; Bunel v. O'Day, (C.C.) 125 Fed. 303, 317;Patterson v. Gaines, 6 How. 550, 589, 12 L.Ed. 553.) By and large, none the less, the courts are generally agreed that countervailing evidence may shatter the presumption though the possibility of access is not susceptible of exclusion to the point of utter demonstration." (Compare State v. Soyka, supra.)
In this case we are not driven to a choice "between nicely balanced probabilities." The probabilities are all one way, favoring the appellant. Her claim that she is the daughter of Samuel and Lydia is not only proved by the declarations of the three persons most intimately concerned at the time of the conception — the wife, the husband and the paramour — but it is fortified by many facts and circumstances and by family tradition. The fact seems to have been recognized throughout the family, in so far as there is any proof upon the subject, that she is the daughter of Samuel and not of James. And while the actions of Victoria Cutler, the children of John W. Wray, and of David R. Wray, her half-brother, in disclaiming any interest in the estate of Samuel L. Wray, and favoring the claim of the appellant, may not be of any special significance, they do fortify the assertion that appellant was regarded by the family as the child of Samuel and Lydia.
Unquestionably appellant was born in "the family of the paramour." We do not regard the action of appellant in executing the power of attorney in the matter of the Drew estate of much probative force.
Upon the whole case the great preponderance of the evidence proves that appellant is the daughter of Samuel and not of James. Here the proof is so overwhelmingly against the prima facie case made out by the disputable presumptions *Page 540 
"as to permit of but one reasonable and rational conclusion," which is in appellant's favor. (Renland v. First Nat. Bank,90 Mont. 424, 4 P.2d 488.)
Respondents offered in evidence a statute of Nebraska, in[7] force in 1913, respecting the legitimation of a child by subsequent marriage of the parents, but did not plead it. In the absence of an appropriate pleading, appellant's objection to the admission of the statute was good. (Bank of Commerce v.Fuqua, 11 Mont. 285, 28 P. 291, 28 Am. St. Rep. 461, 14 L.R.A. 588; McKnight v. Oregon Short Line R. Co., 33 Mont. 40,82 P. 661; Gunder v. Huggans, 71 Mont. 449,233 P. 901.)
But even if the statute were admissible, the better rule is that upon the marriage of the father and mother, the law of the domicile of the father is controlling. (5 R.C.L. 920; Blythe v.Ayres, 96 Cal. 532, 31 P. 915, 19 L.R.A. 40; Irving v.Ford, 183 Mass. 448, 67 N.E. 366, 97 Am. St. Rep. 447, 65 L.R.A. 177; Pfeifer v. Wright, (C.C.A.) 41 F.2d 465, 73 A.L.R. 932.) The father's domicile was in Wyoming, and in the absence of proof, and there was none, we presume the statutes of that state are the same as our own. (State ex rel. Rankin v.American Bank Trust Co., 76 Mont. 445, 247 P. 336;Springhorn v. Roberts, 77 Mont. 395, 250 P. 1112.) Our own[8] provides that a child born before wedlock becomes legitimate by the subsequent marriage of the parents. (Sec. 5852, Rev. Codes 1921.) There are no limitations to this statute. It is the expression of a policy which cares more for the present welfare of the child than for the past sin of its parents. Upon the subsequent marriage of the parents the child born theretofore to them becomes legitimate for all purposes. (5 R.C.L. 919; 7 C.J. 951; Blythe v. Ayres, supra; Pfeifer v. Wright, supra; Brisbin v. Huntington, 128 Iowa, 166, 103 N.W. 144, 5 Ann. Cas. 931; Allison v. Bryan, 21 Okla. 557, 97 P. 282, 17 Ann. Cas. 468, 18 L.R.A. (n.s.) 931.)
For the foregoing reasons the judgment is reversed and the cause remanded to the district court of Silver Bow county, *Page 541 
with direction to enter a decree declaring the appellant the daughter and heir of her father, Samuel L. Wray, deceased. Costs of this proceeding shall be paid out of the estate.
ASSOCIATE JUSTICES MATTHEWS, STEWART and ANDERSON concur.