In re COLBERT'S ESTATE. STATE, Appellant, v.
BUSH et al., Respondents.

(No. 3,548.)

(Submitted November 6, 1915.  Decided December 22, 1915.)

[153 Pac. 1022.]

*Probate Proceedings — Heirship — Evidence — Insufficiency —
Depositions—Admissibility and Inadmissibility—Waiver—
Family Bible—Hearsay Testimony—Parties.*

Trial—Evidence—Depositions—Admissibility.
    1.  Under subdivision 8 of section 7887, Revised Codes, the testimony
of a witness deceased or out of the jurisdiction, in the form of depo-
sitions, given in a former action between the same parties relating to
the same matter, may be received.

    [As to admissibility of former deposition or testimony of witness
who has since become mentally incompetent to testify, see note in Ann.
Cas. 1914B, 284.]

Same.
    2.  To make testimony of the character referred to in paragraph 1, *supra,*
admissible, the former action in which it was given must have been
one within the power of the court to entertain.

Probate Proceedings—Determining Heirship—Exclusive Procedure.
    3.  Inasmuch as the procedure provided by sections 7670–7672, Revised
Codes, for determining the rights of all persons to an estate or an
interest therein, excludes every other method, an independent civil ac-
tion for that purpose was unauthorized, and depositions taken in it
were not taken in a former action, and hence inadmissible in a proceed-
ing instituted under the sections *supra.*

Trial—Evidence—Depositions—Immaterial Errors.
    4.  Depositions taken without the state were not made inadmissible be-
cause of minor differences in the spelling of the names of the deponents,
nor because the notary certified that the depositions were, before signing,
corrected by him instead of by the deponents.

Same—Defective Depositions—Waiver.
    5.  Where objections to the admission of depositions such as those re-
ferred to in paragraph 4 were required by the rules of the district court
to be made in writing and filed before trial, a noncompliance with the
rule constituted a waiver of the defect.

Same—Declarations—Identification of Person—Admissibility.
    6.  Testimony of declarations made to the witnesses by decedents that
the latter had received letters from their nephew C. from a certain
town, though hearsay, was nevertheless admissible under section 7887,
Revised Codes, as going to the identification of the person testified to
by them as being their nephew.

Same—Declarations—When Inadmissible.
    7.  The admissibility of declarations of decedents of the character above,
being an exception to the rule against hearsay, rests upon necessity;
hence where no necessity appeared for admitting the contents of the

letters referred to in paragraph 6, *supra,* testimony of declarations made by the recipients as to what they contained was inadmissible.

[As to admissibility of declarations after death of declarant against persons not privies, see note in 94 Am. St. Rep. 673.]

Same—Evidence—Contents of Letters—Admissibility.

8. Testimony by witnesses who claimed to have read the letters mentioned in paragraphs 6 and 7, *supra,* giving their purport or contents, was admissible.

Same—Relationship—Admissibility.

9. Testimony of a declaration claimed to have been made by the person whose estate was before the court in a proceeding to establish heirship, that he and a companion were cousins, was admissible under section 7887, Revised Codes, as one touching relationship.

Same—Declarations—Identification of Person—Language—Admissibility.

10. Testimony of declarations of decedents to the effect that the person with whom kinship was sought to be established spoke German entirely or English very brokenly was properly admitted, since language is a personal characteristic, and a description of personal characteristics is competent for purposes of identification.

Same—Evidence—Family Bible—Admissibility.

11. The admissibility of a family Bible in evidence does not depend upon authorship or authenticity of the entries made therein, but upon the fact that it is the family Bible and record, recognized as such by those with whose genealogy or pedigree it is concerned; and neither chronological order nor superficial integrity can be a condition precedent to its reception; hence the fact that an entry in penmanship and ink more modern than the entries preceding or succeeding it had been made over an apparent erasure did not affect its admissibility.

Same—Hearsay Testimony—Inadmissibility.

12. Testimony in proof of loss of letters that the witness had been told they had been destroyed was inadmissible as hearsay.

Same—Declarations—Relationship—Prerequisite to Admissibility.

13. Under sections 7869 and 7887, Revised Codes, before testimony detailing declarations, acts and attitude of persons deceased or out of the jurisdiction to show relationship, can be admitted, the relationship of the declarant to the family whose history he refers to must be shown by evidence independent of his own statement.

Same—Evidence—Certificate of Naturalization.

14. The certificate of naturalization of an alien is not conclusive upon the question of nativity.

Probate Proceedings—Determining Heirship—Parties.

15. In a proceeding brought under sections 7670–7672, Revised Codes, to establish heirship, the petitioner is plaintiff, and has the burden of proof.

Same—Documentary Evidence—Review.

16. Where a proceeding to determine heirship rests mainly upon depositions, the supreme court on appeal may as effectively judge of their probative value as the trial court.

Same—Determining Heirship—Evidence—Insufficiency.

17. Evidence *held* insufficient to support a finding that petitioners were the heirs of a decedent whose estate was claimed by the state as an escheat for want of heirs.

*Appeal from District Court, Silver Bow County; John B. Mc-Clernan, Judge.*

PROCEEDINGS by Joseph A. Bush and others to determine their heirship to an estate claimed by the state under an escheat for want of heirs. From a judgment for claimants and from an order denying the state a new trial, the state appeals. Reversed and remanded, with directions to dismiss the respondents' petition.

*Mr. J. B. Poindexter*, Attorney General, *Mr. C. S. Wagner*, Assistant Attorney General, and *Messrs. L. P. Donovan* and *Carl J. Christian*, for Appellant, submitted a brief; *Mr. Wagner* and *Mr. Christian* argued the cause orally.

"The right to use depositions in evidence is regulated by statute, and none are admissible in the trial of issues of fact unless under some positive provision of law." (*Cunningham* v. *Hall*, 4 Allen (86 Mass.), 268.) It was held in this case that a deposition taken to be used in the United States court in a cause of which that court had no jurisdiction is inadmissible in evidence, although taken in a cause relating to the same subject and between the same parties. And in *Morrow* v. *Hatfield*, 6 Humph. (25 Tenn.) 108, it was decided that depositions cannot be read unless taken in reference to issues made up at the time they were taken; and in *Kyper* v. *Shaeffer*, 42 Pa. Sup. Ct. Rep. 277, it was declared that there must be an identity of subject matter in whole or in part, and identity of parties must unite to render testimony in one case admissible in another case; and in *People* v. *Brugman*, 38 N. Y. Supp. 193, 3 App. Div. 155, it was held that the deposition of a witness taken to be used in an action cannot be read in another action after the death of the witness. (See, also, *Castleberry* v. *Bussey* (Tex. Civ.), 166 S. W. 14; *Miller* v. *Gillispie*, 54 W. Va. 450, 46 S. E. 451.)

The taking of depositions is in derogation of the common law, and for that reason must be strictly construed and literally followed. (*Williams* v. *Chadburne*, 6 Cal. 559; *Homberger* v. *Alexander*, 11 Utah, 363, 40 Pac. 260; *Dye* v. *Bailey*, 2 Cal. 383; *McCann* v. *Beach*, 2 Cal. 25; *Darby* v. *Heagerty*, 2 Idaho, 26C (282), 13 Pac. 85; *People* v. *Mitchell*, 64 Cal. 85, 27 Pac. 862.)

To the effect that where a deposition is taken the witness produced must be the same, and have the same name as the witness for the taking of whose deposition a commission was issued, we cite *McCoy* v. *People*, 71 Ill. 111; *Strayer* v. *Wilson*, 54 Iowa, 565, 7 N. W. 7; *Scholes* v. *Ackerland*, 13 Ill 650; *Patterson* v. *Wabash etc. Ry. Co.*, 54 Mich. 91, 19 N. W. 761; *Glenn* v. *Gleason*, 61 Iowa, 28, 15 N. W. 659.

Under the statute the deposition must be corrected by the witness and not by the notary, and we contend that where it appears that the witness did not correct the deposition, but that the notary did so, the deposition is not entitled to be admitted in evidence. (Jones on Evidence, sec. 694; *Homberger* v. *Alexander*, 11 Utah, 363, 40 Pac. 260; *People* v. *Mitchell*, 64 Cal. 85, 27 Pac. 862; *Ball* v. *Sykes*, 70 Iowa, 525, 30 N. W. 929; *Brewer* v. *Bowersox*, 92 Md. 567, 48 Atl. 1060; *McCormick* v. *Largey*, 1 Mont. 158; *Davis* v. *Allen*, 14 Pick. (31 Mass.) 313; *Nasser* v. *Gaston*, 70 Wash. 685, 127 Pac. 470.) Relating to the method of proving entries in family Bibles, in this class of cases, see Jones on Evidence, sec. 317; *McDeed* v. *McDeed*, 67 Ill. 545; *Kreitz* v. *Behrensmeyer*, 125 Ill. 141, 8 Am. St. Rep. 349, 17 N. E. 232; also note in 41 L. R. A. (n. s.) 449.

To the effect that under the circumstances of this case the family Bible should not have been admitted in evidence, we cite the following authorities, which hold that a mutilated or altered instrument cannot be received in evidence until the party offering same has explained away such alteration or mutilation: *Smith* v. *United States*, 2 Wall. (U. S.) 219, 17 L. Ed. 788; *Wheat* v. *Arnold*, 36 Ga. 479; *McMicken* v. *Beauchamp*, 2 La. 290; *Pipes* v. *Hardesty*, 9 La. Ann. 152, 61 Am. Dec. 202; *Cornog* v. *Wilson*, 231 Pa. 281, 80 Atl. 174; *Glover* v. *Gentry*, 104 Ala. 222, 16 South. 38; *Wheadon* v. *Turregano*, 112 La. 931, 36 South. 808; *Withers* v. *Hart*, 96 Miss. 453, 51 South. 714; *Messi* v. *Frechede*, 113 La. 679, 37 South. 600; *Matson* v. *Jarvis* (Tex. Civ.), 133 S. W. 941; Greenleaf on Evidence, sec. 564.

The action of the court in permitting various witnesses to give evidence as to the declarations made by deceased members

of the Cross-Bush family, as to the relationship between that family and Charles Colbert, was error. Before such declarations could be admitted in evidence, the relationship between the deceased person, who made the declaration, and the person concerning whose pedigree the declarant spoke, must have been established by evidence other than the declaration itself. (Wigmore on Evidence, sec. 1490; *Fulkerson* v. *Holmes*, 117 U. S. 389, 29 L. Ed. 915, 6 Sup. Ct. Rep. 780; *Flora* v. *Anderson*, 75 Fed. 217; *Jackson* v. *Jackson*, 80 Md. 176, 30 Atl. 752; see, also, 22 Am. & Eng. Ency. Law, 641; *Greene* v. *Almand*, 111 Ga. 735, 36 S. E. 957; 1 Wharton on Evidence, sec. 218; 1 Greenleaf on Evidence, sec. 114.)

*Messrs. J. B. Clayberg, Edward Horsky, C. A. Loomis* and *John F. Wade*, for Respondents, submitted a brief and argued the cause orally.

The burden is upon the appellant to show to this court that the evidence decidedly preponderates against the findings of the trial court. It will not reverse such finding because the evidence is contradictory and might have justified the opposite finding by the court below. The position of the parties is well stated in *In re Kasson's Estate*, 141 Cal. 33, 74 Pac. 436, in which the court said: "In a proceeding to establish heirship every party is an independent actor, and is a plaintiff against all others whose claims are adverse, without regard as to whether he is styled plaintiff or defendant in the proceedings." But not only was the state a plaintiff in the trial court, but numerous presumptions arising in the case were against it and in favor of respondents; and therefore in the trial court as well as in this, by far the greater burden of the weight of the evidence rested upon it. "Every person dying is presumed to leave heirs." (*Melzner* v. *Northern Pac. R. Co.*, 46 Mont. 277, 127 Pac. 1002; *People* v. *Roach*, 76 Cal. 294, 18 Pac. 407; *Wilbur* v. *Tobey*, 16 Pick. (33 Mass.) 177, approved in *Hamilton* v. *Brown*, 161 U. S. 256, 40 L. Ed. 691, 16 Sup. Ct. Rep. 585; *Wiederanders* v. *State*, 64 Tex. 133; 2 Am. & Eng. Ency. Law,

327; *People* v. *Fulton Fire Ins. Co.,* 25 Wend. (N. Y.) 205, 218.) In *Smith* v. *Smith,* 140 Wis. 599, 123 N. W. 146, the court held that in proceedings to establish heirship, paternity may be proven by the preponderance of the evidence, and need not be established beyond a reasonable doubt, nor by evidence clear and convincing beyond reasonable controversy; that it has to be proven by the best evidence the case will admit of— no more. Also, under authority, of *Taylor* v. *Benham,* 5 How. (U. S.) 233, 12 L. Ed. 130, and many other authorities, escheats are not favored in the law, and in order to establish an escheat, the clearest and most convincing evidence is required, such as will establish beyond a reasonable doubt that there are no heirs. A strong presumption arises from the identity of name, the heirs having traced Charles Colbert from his mother's home to Butte. This presumption continues throughout the case. (Sec. 7692, Rev. Codes, subd. 25; *Stapleton* v. *Pease,* 2 Mont. 550; 1 Greenleaf on Evidence, 575; 2 Phillips on Evidence, 606.) For a strikingly similar case of identity and weight of evidence, see *In re Succession of Seymour,* 52 La. Ann. 120, 24 South. 818, 26 South. 783. Another similar case is *In re Clark's Estate,* 13 Cal. App. 786, 110 Pac. 828.

In the case of depositions, "it is not material that the parties be identical, or that there be complete mutuality in respect to their relation to each other." (13 Cyc. 1004.) "It is sufficient if the same matter was in issue in both cases, and if those against whom the depositions were offered or those under whom they claim the right or estate in question had an opportunity of cross-examining the witnesses and testing the truth of their testimony." (*Dawson* v. *Smith,* 3 Houst. (Del.) 335; *Wade* v. *King,* 19 Ill. 301; *Cannon* v. *White,* 16 La. Ann. 85; *Parsons* v. *Parsons,* 45 Mo. 265; *Haupt* v. *Henninger,* 37 Pa. St. 138.) "Depositions taken in a former suit between the same parties involving the same question or subject matter are usually admissible when the question again rises for judicial determination." (13 Cyc. 1004; *Consolidated Lumber Co.* v. *Fidelity & Deposit Co.,* 161 Cal. 397, 119 Pac. 506; *Miller* v. *Calumet*

*Lumber etc. Co.*, 121 Ill. App. 56; *Lake Erie etc. R. Co.* v. *Huff-man*, 177 Ind. 126, Ann. Cas. 1914C, 1272, 97 N. E. 434; *Andricus* v. *Pineville Coal Co.*, 121 Ky. 724, 90 S. W. 233; *Larsen* v. *Home Tel. Co.*, 164 Mich. 295, 129 N. W. 894; *Atwood* v. *Atwood*, 86 Conn. 579, Ann. Cas. 1914B, 281, 86 Atl. 29; *Roll* v. *Howell*, 9 Ala. App. 171, 62 South. 463.) "Even at common law, complete mutuality is not required. A deposition taken in one suit and offered in another is admissible if the matters in issue are the same and the party against whom the deposition is offered had full power to cross-examine." (*Haupt* v. *Henninger*, 37 Pa. St. 138; *Allen* v. *Farmers' etc. Nat. Bank*, 129 Ga. 748, 59 S. E. 813; *Freeman* v. *Brown*, 151 N. C. 111, 65 S. E. 743; *St. Louis etc. R. Co.* v. *Hengst*, 36 Tex. Civ. App. 217, 81 S. W. 832; *Coke* v. *Fountain*, 1 Vern. 413, 23 Eng. Reprint, 554; *Hartis* v. *Charlotte Electric R. Co.*, 162 N. C. 236, Ann. Cas. 1915A, 811, 78 S. E. 164.)

Slight mistakes in names not likely to mislead the other party do not vitiate depositions. (*Pape* v. *Wright*, 116 Ind. 502, 19 N. E. 459.) Difference in name in notice and signature, where not misleading, not fatal. (*Galveston etc. Ry.* v. *Morris*, 94 Tex. 505, 61 S. W. 709.) *Idem Sonans*: *Western Union Tel. Co.* v. *Drake*, 14 Tex. Civ. 601, 38 S. W. 632; *Miller* v. *Frey*, 49 Neb. 472, 68 N. W. 630; *Harlan* v. *Richmond*, 108 Iowa, 161, 78 N. W. 809. There are many cases where depositions have been received notwithstanding an error as to the names of the witnesses in the notice of taking, where there was such similarity of names as to easily cause mistake, and where the other party has not been misled to his injury. (*International etc. R. Co.* v. *Kindred*, 57 Tex. 491; *Kent* v. *Buck*, 45 Vt. 18; *Bibb* v. *Allen*, 149 U. S. 481, 37 L. Ed. 819, 13 Sup. Ct. Rep. 950; *Strayer* v. *Wilson*, 54 Iowa, 565, 7 N. W. 7; *Tompkins* v. *Williams*, 19 Ga. 569; *Braley* v. *Braley*, 16 N. H. 426.)

In pedigree cases, declarations of deceased relatives as to the relationship, birth, marriage or death of a particular person are treated as primary evidence, as a part of family history, reputation and tradition, and are classed with descriptions in

Bibles or wills, or upon monuments. The fact that deceased made the declaration is the evidence. These include declarations of every kind, whether in respect to family communications or otherwise. (Jones on Evidence, sec. 316; *Jarchow* v. *Grosse*, 257 Ill. 36, Ann. Cas. 1914A, 820, 100 N. E. 290; *Norris* v. *Edwards*, 90 N. C. 382, 47 Am. Rep. 526; *Byers* v. *Wallace*, 87 Tex. 503, 28 S. W. 1056, 29 S. W. 760; *Mason* v. *Fuller*, 45 Vt. 29.)

MR. JUSTICE SANNER delivered the opinion of the court.

Charles Colbert, late of Butte, died intestate on February 14, 1901. He left considerable property, but no wife, child, parent, brother, sister, uncle or aunt him surviving. The present proceeding was initiated in the matter of his estate pending in the district court of Silver Bow county, under sections 7670 to 7672, Revised Codes, the respondents claiming to be heirs of said decedent, as the son of Nancy Cross Colbert, late of New York and Pennsylvania. The trial court, sitting without a jury, found and adjudged in accordance with the respondents' claim, and from that judgment, as well as from an order denying a new trial, the state of Montana, demanding an escheat for want of heirs, has appealed.

The main question presented is the sufficiency of the evidence to justify the findings and judgment. As this of course means competent and credible evidence, since it is not to be assumed that the trial court based its findings upon any other kind (*Finlen* v. *Heinze*, 28 Mont. 548, 73 Pac. 123; *Lane* v. *Bailey*, 29 Mont. 548, 75 Pac. 191), we must first ascertain what portions of this voluminous record there are to which, for the reasons assigned by appellant, no probative value can be given.

1. The first contention is that certain depositions, *viz.*, those of Mary E. Cross, Naomi D. Edwards, Sarah J. Musser and Jabez Tillotson, ought not to have been received and ought not to be considered for the reasons (a) that they were not taken in this proceeding, and (b) that they were not taken in

any other action or proceeding which any court in this state had jurisdiction to entertain.

(a) The respondents concede that these depositions were not taken in the present proceeding, but were taken in a certain cause numbered A195, commenced as a civil action by Joseph Cross *et al.*, plaintiffs, against the State of Montana, Gerald Colbert *et al.*, defendants. It is insisted that they were nevertheless admissible under the provisions of section 8010, Revised Codes; but as they were taken without the state under the provisions of sections 8002–8006, Revised Codes, we question whether section 8010 affords any warrant for their [1] admission. However that may be, the Code elsewhere provides that upon a trial, evidence may be received of "the testimony of a witness deceased, or out of the jurisdiction, or unable to testify, given in a former action between the same parties relating to the same matter." (Rev. Codes, sec. 7887, subd. 8.) The record sufficiently shows that two of these deponents are dead, and that the other two reside in far eastern states. This being so, the objection that the depositions were not taken in this proceeding may be dismissed for the more important inquiry, whether cause A195 was a "former action between the same parties, relating to the same matter."

(b) We take it that the phrase "former action," as used in subdivision 8 of section 7887, means any action or proceeding which has progressed far enough to enable testimony to be [2] taken. But to be an "action or proceeding" in this sense, to give sanction to the oath of a witness so that his deposition may constitute "testimony," the proceeding must be one within the power of the tribunal entertaining it to hear. Was A195 such a proceeding? We think not, accepting the respondents' assurance that it involves the same parties and relates to the same matter as the present proceeding; for, if, that be true, we have an independent civil action, brought to determine the right of respondents to succeed as heirs to an estate which then was and still is undistributed. It has been [3] settled by this court that the "complete procedure for

determining the rights of all persons to an estate and all in-terests therein and to whom distribution thereof should be made," provided by sections 7670, 7671 and 7672, Revised Codes, "must be held upon well-known rules of statutory con-structions to exclude every other procedure for determining such questions." (*In re Fleming's Estate,* 38 Mont. 57, 59, 98 Pac. 648.) It follows that no such action as A195 could be brought, no court of this state could have jurisdiction of it, and no sanction could be afforded by it for the depositions in question. They are therefore no valid part of the evidence in this proceeding.

2. It is next insisted that certain other depositions, to-wit, those of Mary Ozburn, James Clement and Nettie Armagost, [4] were inadmissible, because the stipulations under which they were taken authorized the depositions of Mary Oxburn, James Clements and Nettie Amagost. It is not and cannot be urged that the deponents are not the same persons whose depo-sitions were intended by the stipulations. They were the same, and we think the minor differences disclosed in the spelling of their names should have been beneath the notice of the state of Montana, whose right here is wholly contingent upon the absence of lawful heirs, but whose interest demands in this, as in all other cases, that justice be done as nearly as possible. [5] Moreover, under Rule 16, rules of the district court of Silver Bow county, such objections as these are required to be in writing and filed before trial; so that, if they ever had sub-stantial merit, which is doubtful, we think it was waived by failure on the part of the state to make the objections in time. (*Murray* v. *Larabie,* 8 Mont. 208, 19 Pac. 574.)

3. The same considerations apply to the proposition that the depositions of John Laisy, Eugene Bush, Josephine Joslyn, Joseph Cardner, Evaline F. Rice, Mary Ozburn, James Clement, Bessie Beedy and Nettie Armagost should have been rejected because the certificates thereto were defective. In each of these depositions the notary certified "that the deposition was re-duced to writing, and when completed was carefully read to

the witness, and being corrected by *me,* was by him subscribed in my presence and sworn to as above specified.'' The point is made that under section 8008, Revised Codes, the certificates should show that the depositions were ''read to the witness and corrected by *him.''* These depositions were all taken without the state; section 8008 does not apply to them; and the objections, if valid, were not timely. (*Murray* v. *Larabie, supra.*)

4. All the witnesses for the respondents who pretend to know or to have heard family talk upon the subject agree that there was such a person as Nancy Cross; that at some time she married a man named Colbert and had a son called Charles; that she had several brothers, among them Joseph Cross, who came to Iowa prior to 1865 and lived there until 1886; that she had one sister, Fanny Cross Bush, through whom the claimants of record deraign their kinship. The respondents themselves assert that Charles was the son of Colbert, but five of their witnesses testify that Nancy Cross was married twice, first in 1834 to William Bush, who became the father of her only boy, and that William Bush had a sister, Mrs. Alvina Clement, late of Illinois. As bearing upon the claim that the Charles Colbert with whose estate we are concerned, was the son of Nancy Cross certain testimony was received, the character of which may be exemplified as follows: (a) Testimony of declarations, [6-8] alleged to have been made to the witnesses speaking, by Joseph Cross, Fanny Cross Bush and Alvina Clement, all now deceased, to the effect that they had received letters from their relative Charles Colbert, from Butte; (b) testimony by the witnesses to whom such declarations are alleged to have been made, giving the purport or contents of such letters as told to the witnesses, they not having read or seen the letters; (c) testimony by witnesses who claim to have read one or more of such letters, giving the purport or contents of the letters so claimed to have been read. The principal objections urged to this testimony were that it is hearsay, that it is secondary evidence, and that there is nothing to show who wrote the letters. If an objection that evidence is secondary can be good where

the witness does not pretend to give the contents of a writing as recollected by him after reading the same, then we say it is not tenable here, because it affirmatively appears that all of Mrs. Clement's papers were destroyed at her death, and there is enough to justify an inference to the same effect concerning the alleged letters to the other persons, having in mind their private and transitory character. The other objections, however, are not so easily met. Confessedly, the testimony typified by the examples (a) and (b) was hearsay; but respondents contend it was nevertheless admissible (the declarants being dead) under the provisions of section 7887, Revised Codes. As regards the fact that such letters were received, we think the respondents' contention must be upheld. Other declarations by each of these persons that they had a nephew called Charles Colbert had been properly admitted; and the declarations now considered go to identification, by placing the Charles Colbert claimed to be a relative as in Butte at the time the letters were written. (2 Jones on Evidence, p. 711; *Byers* v. *Wallace,* 87 Tex. 503, 28 S. W. 1056, 29 S. W. 760.) The admissibility of such testimony as this, however, is an exception to the rule against hearsay, and rests in all cases upon necessity. (Wigmore on Evidence, secs. 1420, 1421.) With the necessity ceases the exception; and as no necessity appears for admitting the contents or substance of these letters, we must hold the rulings below to that extent erroneous. The ground of objection that there is nothing to show who wrote the letters is without merit; *prima facie* they purported to be from the nephew of the recipients, named Charles Colbert, writing from Butte, but whether the writer was the Charles Colbert whose estate is here in question, is made to depend upon inference, presumption or other evidence. To the testimony illustrated by example (c) we can perceive no objection at all; its purpose was the same as in cases (a) and (b), but if the contents were relevant and material, it was proper to receive them from anyone who knew through actual perusal of the letters.

5. In his deposition the witness Laisy was permitted to testify [9] that in a lawsuit at Saginaw, Michigan, in 1860, both Jay Cross Bush and his companion bearing the name of Charles Colbert testified that they were cousins, their mothers being sisters. Granting there was error in permitting the witness to detail what Jay Cross Bush said, there is no merit in the assignment so far as the alleged declaration of Charles Colbert is concerned; for if it should be that the man who made the declaration was the man whose estate is before us, his declaration of relationship was clearly admissible. (Rev. Codes, sec. 7887.)

6. Certain testimony was received of alleged declarations of [10] persons now deceased, who knew and claimed kinship with Nancy Cross Colbert and her son Charles, to the effect that Charles spoke German entirely or English very brokenly, and that his mother spoke both languages. Exception is taken to this, but without reason so far as the language of Charles is concerned. Language is certainly a personal characteristic; a description of the person and characteristics of the individual with whom kinship is declared, coming down with such declarations, is part of them and is competent to be shown for purposes of identification. (Wigmore on Evidence, sec. 1494.)

7. Accompanying the deposition of Bessie Beedy is the [11] mutilated portion of a Bible which bears the imprint "1852." It contains certain pages which were originally blank save for the heading "Family Record," each divided into columns headed for marriages, births and deaths. It contains entries of dates as ancient as 1754, and under the head of "Marriages" narrates that of "William Bush to Nancy Cross, 1834." This entry is over an obvious erasure and in penmanship and ink quite different from and more modern than the entries preceding and succeeding it. This record has relevancy only in connection with the alleged relationship of Charles Colbert to Alvina Clement. The witness Beedy, who was born in 1846, testified that this Bible was her mother's, that it is among the earliest recollections of her childhood, and that she always understood that it had belonged to her grandmother. According

to the record the grandmother died in 1850. The state insists that under these circumstances, with nothing to explain them, the Bible was not admissible. The learned trial judge in receiving it said: "I will admit it in evidence; what weight I will give it is a matter for future consideration. I don't like the looks of it." With this attitude we are in entire accord. The admissibility of a family Bible containing a family tree or record does not depend upon authorship or authenticity of the entries; but upon the fact that it is the family Bible and record, recognized as such by those with whose genealogy or pedigree it is concerned (*People* v. *Ratz,* 115 Cal. 132, 46 Pac. 915; *Jones* v. *Jones,* 45 Md. 144), and for the same reason neither chronological order nor superficial integrity can be a condition to its reception, whatever effect these circumstances may have upon its probative value. So, in view of the testimony of Mrs. Beedy that these entries were made by persons who are now dead, and that the Bible and record have always been recognized in the family of Mrs. Clement as their family Bible and record, we think it was admissible, though as a factor in respondents' case it may be worse than worthless.

8. On the theory that to admit evidence touching the alleged **[12]** letters received by Joseph Cross direct proof of their loss was required, John F. Wade, an attorney for the respondents, was permitted to testify that Joseph Cross, Jr., told him they had been destroyed. This, of course, was pure hearsay, inadmissible as a matter of law, and valueless in point of fact.

9. Numerous errors are assigned upon the admission of **[13]** testimony detailing the declarations, acts and attitude of persons deceased or out of the jurisdiction, for the purpose of showing relationship within the Bush and Clement families, as well as toward Nancy Cross Colbert and her son. It is contended that this evidence was admitted without first showing that some relationship existed, and the objection to it is stated in the language of Wigmore, as follows: "The qualifications of the deceased declarant—his relationship or whatever is re-

lied upon as equipping him with information—must be shown in advance. In other words, the relationship of the declarant to the family whose history he refers to must be shown by evidence independent of his mere declaration; otherwise there would be a begging of the question. The only apparent exception is found in the case of a declarant speaking of his own personal history." (Treatise on Evidence, sec. 1490.) Setting aside the order of proof, which is always within the sound discretion of the court, we think this excerpt states the law under the provisions of our statute. (Rev. Codes, secs. 7869, 7887.) The point involved in these declarations, however, is not the relationship of these declarants to the Charles Colbert whose estate is before us, but their relationship to each other and to Nancy Cross Colbert and her son, and as to this it is our opinion that the requirements of the rule stated were sufficiently met.

10. It is vigorously insisted that forasmuch as the record [14] shows the naturalization of Charles Colbert, deceased, as a native of Germany, this is conclusive, and no finding to the contrary was legally possible. There is nothing in this. The naturalization of a supposed alien is for some purposes conclusive as to the citizenship of the applicant; and the record, if regular on its face, may be evidence that the applicant claimed nativity in the foreign country specified and that his good moral character was sufficiently attested. It cannot, however, in a distinct proceeding, having nothing to do with his citizenship, be regarded as an adjudication of the age, residence or good character of the applicant (*Mutual Benefit L. I. Co.* v. *Tisdale,* 91 U. S. 238, 245, 23 L. Ed. 314), and if it be no adjudication of these, it cannot be conclusive upon the question of nativity.

11. As regards the claim asserted by them, the respondents [15] were plaintiffs (*Estate of Kasson,* 141 Cal. 33, 74 Pac. 436), and they had the burden of proof. Their case rests mainly [16] upon depositions the value of which we may judge as effectively as the trial court (*Bordeaux* v. *Bordeaux,* 43 Mont. 102, 115 Pac. 25), and if it shall be clear to us that the weight of the evidence is not with, but is against, the findings in their

favor, the duty of this court is to so declare and to determine the case accordingly. (Rev. Codes, sec. 6253; *Bordeaux* v. *Bordeaux*, 32 Mont. 159, 80 Pac. 6.)   It is fair to premise, as an [17]   element in the due appreciation of the evidence, that the earliest notice taken of this estate by any of the respondents was after the matter had been in litigation for some time, after the claim of the state to an escheat for want of heirs had been publicly asserted, and after the supposed facts touching the identity of the deceased Charles Colbert had become notorious. The most salient of these supposed facts are, that Charles Colbert claimed to have been born in Germany in 1834 or 1835; to have left that country after his father, mother and only sister had died; to have worked in New York state and at a sawmill near Saginaw, Michigan; to have left for Peru by the Isthmus of Panama, but learning at Aspinwall that Peru was at war, to have changed his mind, going to California; to have left California for the northwestern mining regions, arriving first in Idaho; to have engaged in prospecting there and thereafter in Montana, at Confederate Gulch and elsewhere, and to have settled in Butte in 1866; also, that he was short of stature, had blue eyes and spoke English brokenly; that he died in 1901 without known heirs, and that his estate was of considerable value.   No elaborate analysis of this extensive record could be accomplished within any reasonable space.   The evidence of the respondents, taken *in toto,* may be said to establish that Nancy Haire, of Scotch descent, and Zacharia Cross of German descent, were born in what is now the state of New York in 1772, intermarried in 1799, and had several children, all of whom are dead, but four of whom, *viz.,* Solomon, Nancy, Fanny and Joseph, had lawful issue; the children of Nancy were Charles and Jennie, but Jennie died in childhood; the children of the others, or the issue of such children, are the claimants at bar.   Some of them testify as the tradition in their family that Nancy Cross married a German named Jacob Colbert, which marriage was contrary to the wishes of her parents, because Colbert had been in the country but a short time and could speak no Eng-

lish; that she moved with her husband into Pennsylvania, a distance of two days' walk from Solon, New York, and there her son Charles, by her husband Jacob Colbert, was born in 1834; but Jay Cross Bush asserts that Jacob Colbert's father fought in the Revolutionary War, while Joseph A. Bush declared—until dissuaded by Jay Cross Bush—that the husband's name was James Colbert, that he and Nancy lived for a time in Michigan, and that Charles was born in Cortland county, New York. However, as noted in the fourth division of this opinion, Charles appears to have been blessed with two natural fathers. His first appearance to anyone who testifies here was at the age of ten or eleven years, while on a visit to Mrs. Beedy's parents at Taylor, Cortland county, New York; at the age of seventeen or eighteen he again visited at the same place accompanied by his mother; Mrs. Beedy distinctly remembers both visits, and says that on the last occasion he was slight, small, light-complexioned and spoke English. His next appearance is recorded by Jay Cross Bush, and as the testimony of this witness forms the backbone of respondents' case, we shall state it in some detail, with reasons for our disbelief. He says he was with Charles, the son of Nancy Colbert, from 1859 to 1866; first met him at Kenosha county, Wisconsin, and went with him to Saginaw, Michigan, where Charles bought an interest in a sawmill; left there the summer of 1860 and went to Rock county, Wisconsin, harvesting; that fall visited the witness' parents in Buchanan county, Iowa, for two or three days; then left for New York, and there took steamer for Aspinwall, en route to Peru; learning in Aspinwall that Peru was at war, decided to go to California; spent that winter in Santa Clara, California; the following spring (1861) went to Idaho to the mines, spending the summer in Idaho Gulch; that fall went to Walla Walla and spent the winter there, working in a brewery; the next spring (1862) came on to Montana; on February 22, 1866, the witness got his feet frozen while working in Confederate Gulch and amputation became necessary, so they came on to Helena, remaining there together until, in the summer of the

same year, the witness left for the east *via* Fort Benton. Charles "was a very small man, very little; he was five feet two inches tall and never weighed more than 120 pounds"; he always carried a Bible, which contained a record; witness first saw it in Saginaw, Michigan, often afterward, and last at Helena in 1866; it stated the marriage of Charles' grandparents, showed them to be the witness' grandparents, showed their children, also "the marriage of Charles Colbert's mother and uncle Colbert," also "the deaths of uncle and aunt Colbert," and was written in German. Charles spoke very broken English; he always claimed he had no relatives save the witness, "because he left Pennsylvania under a cloud and covered up his tracks from that time on; it was trouble over a girl and * * * he was a fugitive from justice; shortly after we went to Saginaw I picked up a paper and read to him where there had been an elopement between Charles Colbert and this woman; he said, 'If that is all they find about it, it is all right'; after we left there and went down to my father's and mother's, where we intended to buy government land and stay; we had been there only two or three days when I picked up a paper and read that there had been something sensational found where Charles Colbert had lived in Pennsylvania, about this supposed elopement, that there had been a woman found in a swamp near where he lived and the only way she could be recognized was by the clothes she had on; when I read this piece I hunched Charles Colbert to come out, which he did, and I read him this piece; he said nothing for a while and then said, 'Look here, I tell you one thing, we have to leave right now; I have to leave to-night; will you go with me?' I said, 'I will go anywhere with you,' and he said, 'We go to-night'; and that same night we went to Independence, Iowa, thence to New York City, and from there around on this trip I have told you about. Charles always concealed his former place of residence after that; he claimed to everybody that he came from Germany and I always said that with him; the last words I had with him was that nobody would hear or find out the ad-

dress in any way, and I never did tell until this hearing, when I had to."

So far as this story depends upon this deposition, we disbelieve it entirely. There are many reasons for our incredulity, but the principal ones are these: That this witness, here asserting kinship to Charles Colbert, deceased, in virtue of the claim that said deceased was the son of Nancy Cross Colbert, late of New York and Pennsylvania, and here testifying to the existence of two brothers, two sisters, four nieces and four nephews—all heirs if he be such—acknowledges that he deliberately swore on four previous occasions, twice in affidavits for depositions, once on oral examination before the district court, and once in a former deposition, that he was the sole heir of said deceased and deliberately told the attorney general of this state, after Colbert's death, that Colbert's parents were married in Germany, giving details of their life in that country; that here asserting himself to be the son of Fanny Cross Bush, who was born in New York, as were her parents before her to his knowledge, he told the attorney general that his own mother was born in Germany; that always knowing and here testifying to the death of his mother in Wisconsin and that he first met Colbert in that state in 1859, he told the attorney general and swore before the district court upon a hearing of some objections filed in this estate, that his mother died and was buried in Cortland county, New York, and that he and Colbert traveled together from that place to Michigan; that always knowing and here testifying to his own birth in 1834, and that his father was living in 1860, he told the attorney general and swore upon a hearing before the district court and stated in a former deposition that he was an infant when his father died; that always knowing and here testifying that he first saw Charles Colbert in Wisconsin, he swore before the court and stated in a prior deposition that Colbert came to him at his parents' home in Cortland county, New York; that always knowing and here testifying that two other sons had been born to his parents, both of whom were living in 1860, he stated to the

attorney general and swore in a previous deposition that he had never had but one brother, who was dead; and that in the presence of his own counsel, when confronted by his brother Eugene Bush, who was armed with a letter from him, he first denied the relationship, but afterward, admitting it, joined Eugene Bush in a proposition to counsel, which was indignantly rejected, to "keep quiet concerning the relationship of Eugene Bush and the other members of the family and go on" with his claim as Colbert's sole heir. To accept the unaided testimony of such a witness would be a travesty on justice.

As constituting sufficient corroboration of Jay Cross Bush the respondents present: (a) That his story is one which only a man who had been a prospector in the early days of Montana could have told; (b) the testimony of Laisy who deposed that Jay Cross Bush and a companion who called himself Charles Colbert came to Saginaw in the summer of 1859, that he met and knew them socially until their departure in 1860, that he visited their quarters frequently and saw them as often as twice a week, that Charles had a German Bible of "ordinary size" in his room, which he "said he had got from his mother and all her children's names were recorded therein," that Charles had an interest in a sawmill and Jay Cross Bush worked for him, that Charles spoke German, said he was born in Germany and that his parents had lived there, but in a lawsuit which he had over some lumber testified in English that his mother and the mother of Jay Cross Bush were sisters; (c) the testimony of Joseph A. Bush, Eugene Bush and Josephine Joslyn that their brother Jay did visit their home in Buchanan county, Iowa, in 1860, bringing with him a small, blue-eyed, light-haired "good-looking" German, twenty-five or thirty years old, who claimed to be and was accepted as Charles, the son of Nancy Cross Colbert, that Charles spoke German well but English brokenly, that he carried a small hand Bible printed in German, containing a record of the Colbert family, which he said he had got from his mother and with which he refused to part, that from him Fanny Cross Bush and her family first

learned of the death of her sister Nancy Cross Colbert, and that he left with Jay Cross Bush after staying a few days; (d) the testimony of Joseph A. Bush that in 1864 his uncle Joseph Cross spoke of having received a letter from ''my brother Jay and cousin Charles'' from Idaho, and in 1865 or 1866 he saw a letter from ''brother Jay'' to Joseph Cross written from Helena, stating ''Charles and I are together''; (e) the testimony of Eugene Bush and Mrs. Joslyn that their mother, Fanny Cross Bush, told them of letters received ''from brother Jay and cousin Charley while they were in the mountains prospecting together and hunting''; (f) the testimony of John Shober that he thinks he met ''late in '65 or early in '66'' at Diamond City in Confederate Gulch, and afterward in Helena, a ''tall fellow''—a mining man, whose name was Bush and whose feet had been crippled from freezing so that they had to be amputated; (g) the testimony of Joseph A. Bush that in the early seventies he saw Jay Cross Bush and the latter was crippled, his toes being cut off both feet, and that not later than 1875 he read a letter to Joseph Cross from Butte, signed with the name Charles Colbert, inquiring for Jay Cross Bush and asking for an answer to be addressed to Butte in the name of Woolbeater; (h) the testimony of Armagost, Clement, Beedy, Ozburn and Rice, niece and children of Mrs. Clement, that Charles, the son of Nancy Cross, visited Mrs. Clement at her home in Lena, Illinois, that before doing so he had correspondence with her, that he stayed several days, claimed Mrs. Clement as his ''Aunt Viny,'' and said he was living in Butte engaged in mining; and that after this visit he wrote her a number of letters, all of which were from Butte, and which she answered, addressing her replies to ''Charles Colbert, Butte, Montana''; (j) the testimony of Scheuer that the deceased Colbert told him of having prospected at various places, once with a companion whose feet had been frozen; (k) the testimony of Prudhomme that the deceased mentioned Pennsylvania—''he always tell me that's where he was come,'' and said he had mined in Confederate Gulch with a partner named ''Cross

Bûtch or Butch Cross," whose feet had been frozen so that he had to quit; and (1) the testimony of Newkirk that the deceased told him he had lived in Pennsylvania.

We are not disposed to question that all this testimony, taken at face and unopposed, is sufficient to justify the view that Jay Cross Bush may have finally told the truth, and that the deceased Charles Colbert was the son of Nancy Cross Colbert, late of New York and Pennsylvania. Corroboration, however, may be overdone, and it is as dangerous to prove too much as too little. So here, certain suggestive features may be noted. It is strange, for instance, that the story of Jay Cross Bush affords no incident, nor the name of a person, place or thing throughout his whole alleged itinerary by which its truth or accuracy can be brought to the test; that he worked on mining claims for others in Idaho and Montana, but no claim nor owner can he mention; that he should disclose a want of memory as to everything that Colbert failed to tell Woolbeater or the latter failed to recall; that, pledged to keep, as he says he did keep, the identity and whereabouts of his companion a secret, he should have made him notorious by his letters; that he mined in Confederate Gulch when that noted field was at the height of its glory and when Diamond City was its metropolis, yet never heard of such a place, did not believe that such a place existed and did not think there were many miners in the gulch. It is strange that Charles Colbert, the fugitive from justice, anxious to hide his identity because perhaps his life depended upon it, should carry about his person and zealously cherish the record that might hang him, and should leave in his wake a trail of correspondence that a blind man could follow. It is strange that Laisy should describe the companion of Jay Cross Bush at Saginaw as a dark-complexioned man; that though but fifteen years old and attending school, he should have associated so intimately with these two grown men; that he should have Colbert claiming birth in Germany before the need for such a course had become apparent; that recalling vividly such incidents as the Bible and the testimony in court, he cannot remember any other

person—judge, counsel, adversary or partner—concerned in the trial, nor anything else that was said, nor the name of another person in the whole town of Saginaw who might have met or known Bush or Colbert there, and that he was a co-townsman of Jay Cross Bush at Wells, Minnesota, last communicating with him in 1911. It is strange that Joseph A. Bush and other members of the family should testify that he and they first learned from Charles, on his visit in 1860, of the death of Nancy Cross Colbert, when as a matter of fact Joseph Cross knew and told Joseph A. Bush of it, with the circumstances, a year or more prior thereto; that Joseph A. Bush should testify that on their visit Charles did not speak "Pennsylvania Dutch," but spoke, read and wrote High-German, and that his English was poor but understandable, when he had previously testified in one deposition that he did not know whether Charles could talk German or not, but his English was so poor that signs were resorted to, and had testified in two previous depositions that Charles talked "Hog Dutch" or "Pennsylvania Dutch"; that he should now testify concerning the letters to Joseph Cross from Jay Cross Bush at Helena, and from Charles Colbert at Butte, when in previous depositions, though asked for anything within his knowledge that might be of value or interest, he made no mention of them, but testified that he never knew Colbert's address save that it was somewhere in the west; that he should now testify that the name of Colbert, Sr., was Jacob when he thought it was James, testified on a prior occasion that all the family called it James, and distinctly remembers that he himself as a boy always referred to him as "Uncle James"; that he should at first stoutly deny speaking a word to anyone about the substance of his testimony but finally admit that Jay Cross Bush, after being in Butte on this business, made him a three-months' visit at Kansas City, during which they discussed at length their relationship with Charles Colbert, and that Jay Cross Bush then convinced him that the name of Colbert, Sr., was not James but Jacob, and that Charles spoke, not "Pennsyl-

vania Dutch" but High-German, because that was the written language and Charles could read it. It is strange that Joseph Cross should in 1864 have received a letter from "Brother Jay and Cousin Charles" in Idaho, when they had been gone from Idaho for at least two years, and that Eugene Bush, who was born in 1854, should testify as though he had resided in Iowa continuously from 1860 to 1874, if his twin sister, Mrs. Joslyn, is correct in saying that he was adopted, taken south and lived south until nearly grown. It is strange that a man whom Shober met in Diamond City in the early days should be a man who never saw that place and did not know of its existence; and that Charles Colbert should write to Joseph Cross mentioning the name of Woolbeater and asking an answer to Butte in that name four years before Woolbeater ever saw Butte and seven years before he and Colbert met. It is strange, if Charles, the son of Nancy, was born in 1834, that Mrs. Beedy, who was born twelve years later, should remember seeing him when he was ten or eleven years old; that of the five witnesses testifying to his first visit to Mrs. Clement, those who saw him should describe him as a man five feet nine or ten inches tall; and that the only thing which could give the evidence of that visit or the alleged letters to Mrs. Clement any meaning or value, to-wit, the relationship of Charles to Mrs. Clement, should be discredited in effect by the findings and judgment herein. It is strange that Newkirk, to whom Colbert mentioned Pennsylvania as a place where he had lived, should also state that Colbert spoke of having been in Philadelphia, a place where, so far as this record discloses, Charles, the son of Nancy, had never been. Finally, it is strange that to Prudhomme alone should Colbert have mentioned Utah as a place where he had lived or used the name "Cross Butch or Butch Cross" or claimed to have "come from" Pennsylvania, and that Prudhomme should have displayed much willingness to discuss his testimony with counsel for respondents, refusing any information whatever to counsel for the state. It may be

that no one of these features is in itself important; the mass of them leaves an impression which it is difficult to efface.

To combat the showing thus made, the state submitted a volume of evidence amounting to 450 pages of this record, the material portions of which may be abstracted as follows:

William I. Lippincott testified in substance: I knew Charles Colbert from the summer of 1881 until his death and was his attorney; I know his signature; the affidavit Exhibit "B," wherein it is recited that the affiant Charles Colbert "is a declared citizen of the United States, having declared his intentions to become a citizen at a special term of court held at Monticello, county of White, state of Indiana, in the year 1859," was signed by him. He also signed the deposition shown me given on February 16, 1895 (in a case named, pending in the federal court), wherein he testified that he had been a placer miner since 1863; that he arrived in Idaho in 1863, came to Montana in June, 1865, and settled in Butte in July, 1866. I have seen the citizenship papers issued to him at Butte in 1897 and was present when they were issued; he claimed that final papers had been issued to him in Idaho but were burned up in his cabin in 1890, and could not be replaced because the original records were lost. I talked with him often about his history; I told him I was from Pennsylvania, but he told me at various times that he had come from Germany. I know "Pennsylvania Dutch" and can distinguish between it and German; my recollection is Colbert did not speak "Pennsylvania Dutch." He often told me he had no relatives at all; that after his father died, his sister died and then his mother; that when about seventeen or eighteen years of age he left the country and came to America. He told me of going to Aspinwall and across the Isthmus; he came to Butte gradually by way of San Francisco, Walla Walla and Alder Gulch.

Neil Ward, deputy county clerk and recorder of Silver Bow county, produced two election registers, the entries in which show that in 1890 Charles Colbert registered in district No. 10 as "Age? 55; where born? Germany; Papers? Lost"; and

in 1892 he registered in district No. 8 as, "Age? 57; where born? Prussia; made affidavit of papers lost."

James F. O'Brien, deputy clerk of the district court, produced the official record of that court showing that on January 9, 1897, Charles Colbert appeared and as a native of Germany took the oath of allegiance to the United States, renounced allegiance to William II, Emperor of Germany, and was thereupon adjudged to be a citizen of the United States.

John Woolbeater testified: "I was born in Hamburg, in the northern part of Germany, in 1840; came to Montana in 1867, to Butte in 1881; was absent from Butte between 1885 and 1890. First met Charles Colbert in 1882; that fall and winter I lived in a cabin about 100 feet from where he lived; saw him every day; talked with him for hours; we were and always have been friendly; after 1890 I lived with him in the same cabin for a couple of years, and after that I lived in a cabin about 100 feet away from him; I took care of him in his later years; often talked with him, nearly every day during the winters about his life, the old country and what he was doing there. He told me that when he was a boy he worked for the farmers, taking out sheep in the morning and bringing them back in the evening, and when he got bigger he took cows out; this was around the village of Karstaedt, Province of Brandenburg, Prussia; after that he worked for a farmer called Nagel, who was a government officer, a 'Schulze'; he said his father and mother worked there the same as he did; he said his father and mother and sister died before he came to America; there were two cousins on his mother's side living in Germany, to whom he had sent money before I knew him. He left Karstaedt once and went to work for the German government at a harbor near Oldenburg. We often talked of Hamburg, which he said he had visited, and he mentioned streets and places that I knew, and he told me he had stopped at the 'Tarhoff,' an emigrant hotel there. He said he had sailed from Bremerhaven in 1858 and entered the United States at New York City; that when he got here he worked on

a farm in New York state for American people; as he could speak no English he soon quit and sought work from Germans, but did not say just where. Later he worked in a sawmill and got an interest in one near Saginaw, Michigan. From there he went to New York, wanting to go to South America, but when he got to Aspinwall they told him there was war in Peru and so he changed his mind and came to California; he worked there on a farm and went from there to Idaho, mining at Idaho City and Silver City. He went from Idaho to Walla Walla, worked in a brewery there, and next spring or summer started for Montana. He said he first worked in the Blackfoot country for wages but did not get them, so he went to work for himself and never worked for wages any more. He spoke of Confederate Gulch as one of the places where he had mined, and that he came from there to Butte in 1866. He never mentioned the name of Jay Cross Bush to me, nor having a partner whose feet had frozen. The German people speak with different dialects, and Colbert's dialect was that of northern Germany. I never knew of his receiving but one letter, and that was from Adolph Wetzstein, who was visiting in Cincinnati; no letters ever came to me or in care of my address for him. He told me he had no relatives. He could not write English but could read printed English. I know Jay Cross Bush; he came to my cabin two or three times and talked to me about this matter, perhaps ten or fifteen minutes, and I told him what I knew about Colbert. Colbert told me he spelled his name differently in Germany, and he spelled it for me, 'Frederick Carl Kolbow.' The only books I ever saw in his possession were a German Bible which he bought after his cabin burned in 1890 from a woman peddler, together with a portrait of Bismarck; Colbert was stuck after Bismarck. I remember writing to Germany in reference to his death; I wrote first to the schoolmaster and to the minister of the church at Karstaedt, and afterward I wrote to Nagel, the 'Schulze.' "

Three letters addressed to Woolbeater, and one certificate admitted by consent as part of the cross-examination of Wool-

beater, all from "Karstaedt, Province Brandenburg, Prussia," dated, respectively, November 23, 1903, December 26, 1905, and January 9, 1906 (2), signed by "Nagel, Magistrate of Karstaedt," assert in effect that Frederick Kolbor, one time a servant of the magistrate's father, emigrated to America in 1858; one letter and the certificate say he was born in Germany on May 9, 1831.

A. W. Barnard testified that he first met Colbert in the fall of 1866, or the summer of 1867, and knew him right well from then to his death; that he talked with him about his birthplace and previous history; that he had heard Colbert say he came from Germany; that about a year and a half before his death the witness called upon him—he was in a pitiable condition—and asked him why he did not get someone to come and look after him; he answered that he had not a relative on earth. The witness asked him about his parents, and he said they were dead. Asked how he got to the country, and he answered that he had stolen on shipboard, landed at Philadelphia, worked first for a German baker, next for an ice-cream maker, then wandered westward as far as St. Louis, where he took a boat which finally brought him to Fort Benton.

George M. Bourquin testified: "I knew Charles Colbert and was his attorney from the fall of 1899 until he died; he spoke to me a number of times about his birth-place and early life. He assured me several times that he had been born in Germany— in Prussia, I think. When around seventeen, or past seventeen, he had come down to the coast and worked in the shipyards there at Kiel. He stated that his father and mother were living at that time; that they had no other relatives; that he had no other relatives at the time he was telling me, his mother and father having died; that the only other relative, other member of the family besides himself, had been a younger sister who died at or about the time he left home. He came down to Kiel and, as I said, worked in the shipyards for a while and then managed to get aboard a vessel and came over to England, and from England he came to America. I think he said

he came to New York. Thereafter he went to San Francisco and finally worked his way up to Montana. He related some instances connected with his trip to Idaho, in reference to prospecting on the way. I never heard him mention the name of Jay Cross Bush, nor speak of having relatives in the United States, or having corresponded with any relatives in the United States at any time. I have an idea that he told me how he got from New York to San Francisco, but I cannot say whether he told me he went across country. I have a recollection of his being in the interior for a while, either in Illinois or Indiana, but whether he went on across or went back by Panama I cannot recollect."

Valendine Kropf testified: "I was born in Germany; first met Charles Colbert about September, '66, here in Butte. He told me he came from Elk Creek or Elk City, Idaho. He talked German, the dialect peculiar to northwestern Prussia, and not Pennsylvania Dutch. He told me he had no relatives. He said he came to Idaho from California. He was a rank Democrat and took 'Brick Pomeroy's Democrat,' a political paper from the states, published at La Crosse, Wisconsin."

Gus Fitschen testified: "I am a resident of Butte for twenty-nine years, German by birth; knew Colbert since 1884 and was quite friendly with him; remember hearing him and a south German named Schwab quarreling in a friendly way about the respective parts of Germany they came from; one would stick up for his part and the other for the part he came from. I would consider from Colbert's language that he was from North Germany; he did not speak Pennsylvania Dutch."

Charles Schmidt testified: "I was born in Baden, South Germany, and lived in Butte since 1881; was well acquainted with Colbert; saw him often. He spoke English brokenly and German well. His dialect was that of the North German province of Brandenburg; he did not speak Pennsylvania Dutch. Very often he said: 'I am a Brandenburger.'"

Louis Lienemann testified: "I have lived in Butte thirty-two years; knew Charles Colbert. I was born in Baden; I speak

German. I knew of Colbert having a friend write letters for him to his sister in the old country and I would write the address for him; I do not remember the name of his sister or the place, except it was Brandenburg, Prussia; perhaps three, four or five letters I addressed, the last in 1883 or 1884. Colbert spoke the Prussian dialect, real Brandenburg; he did not speak Pennsylvania Dutch. He used to sing Prussian songs in the California Brewery, but I did not encourage him; I stopped him. He wrote with difficulty either German or English.''

Certified up to this court as an original exhibit is the photographic copy of a declaration of intention to become a citizen of the United States, made at Monticello, in the circuit court of White county, Indiana; it bears date March 31, 1860; the name of the declarant is uncertain; it looks like ''Frederick Colbon,'' but may be ''Frederick Colbow.''

Peter Breen testified: ''I am an attorney at law; I know Jay Cross Bush and Eugene Bush; I first saw Eugene Bush at my office about nine years ago (1905) several times. He said he was a brother of Jay Cross Bush, who was claiming to be sole heir of Charles Colbert, and he said, 'If Jay Cross Bush had anything coming he was in on it,' that he had no recollection and knew nothing of the relationship himself, but if Jay Cross was a cousin he was; I asked him if he was from Cortland, Cortland county, New York, and he said he was not, nor Jay Cross Bush was not either, and I said, 'That is the place that Charley Colbert and Jay Cross Bush lived'; he says it was not. * * * He said if he left from any place with Jay Cross Bush he left from near Independence, Iowa, but he had no knowledge of it, and there was none of the family had any knowledge of it, with the possible exception of one sister; that there was no one at home that was old enough to remember it, and they knew nothing of it. He asked me if he would work with us in the case and not make known that Jay Cross Bush had perjured himself in this court, would I remain in the case, and I said no, I would not; and I said, 'What is the matter with the rest of those brothers and sisters coming in and mak-

ing the same exposure later?' and he said, 'There is only one of them that is old enough to remember, and it is doubtful if she was, and she is up in [either Minnesota or Michigan, I do not remember which state], and don't know anything of this yet and may never hear of it.' When we, Mr. Morrin and I, told him we wanted no more to do with the case, that we were through, they started to discuss and later called us back and made this proposition about they keeping quiet and not making it public, the relationship, that is the relationship of Gene Bush and the other members of the family, and go on the way we had gone.''

Counsel for the respondents indicate with much precision wherein the evidence for the state is not consistent in detail; that Lippincott and Woolbeater are not worthy of belief; that the case discloses the marvel of a man born and reared in Germany—where compulsory education has prevailed for over a century—who could not write in German; and that Colbert's devotion to ''Brick Pomeroy's Democrat'' is evidence that he did not come from Germany. These things are not to be ignored, but in considering their weight, regard is to be had to the fact that Charles Colbert, the only person who could resolve or fully explain them is dead, that the position of the state is purely defensive and need not be entirely harmonious, and that most of the discordances which do appear are such as may come from the recollection of witnesses touching matters with the minutiae of which they would probably not charge their minds. So, as to Colbert's writing German, the evidence is not altogether consistent, and it is far from proving that he could not do so. But let this be assumed, that fact alone is not decisive against his German nativity. Granting, as of common knowledge, that Germany has led all European nations in attention to popular education, that it is now the aim of a very purposeful government to see that all children attend school for a certain period every year until the age of fourteen is attained, and that in consequence of such policy, illiteracy has been ''practically eliminated'' (8 Universal En-

cylopedia, 640); still, it has not been within the power even of German organization to prevent all evasion, as shown by the fact that 237 out of every ten thousand recruits for the army were unable to read or write as late as 1876 (Encyc. Britanica, Art. "Germany"), and there is reason to believe that the percentage was vastly higher in Brandenburg during the third and fourth decades of the nineteenth century. We confess our inability to appreciate the significance in Colbert's being a "rank Democrat" and taking Brick Pomeroy's paper. *Ex hypothesi*, there is no other alternative: Colbert was from Germany or he was from Pennsylvania; we see no inherent difficulty in an Americanized foreigner becoming a zealous partisan, and the improbability of a German being a Democrat is not demonstrably greater than the like improbability in the case of a Pennsylvanian. In any event, and assuming, for the reasons assigned by counsel, that Lippincott and Woolbeater are to be disregarded save when corroborated, there remains the residuum that on at least twelve specified occasions—five times under oath—Charles Colbert, deceased, declared himself to be a native of Germany, on five of these he mentioned Prussia, on three, the province of Brandenburg in Prussia, and on one the village of Karstaedt in that province and kingdom; that six witnesses who ought to know declare his spoken dialect to have been not "Pennsylvania Dutch" but North German or Prussian; that other testimony shows the persistence of Colbert's claim up to the hour of his death—for he left no will—that he had not a relative on earth. Evidence such as this is not to be lightly treated, nor easily overborne. Indeed, to prevail against it the proof to the contrary should be clear and convincing; and we cannot regard these repeated testimonies of Charles Colbert to his own nativity and identity as satisfactorily avoided by the explanation offered in the evidence for the respondents. Without denying their claim to a relative of that name, we think the case as a whole preponderates against the finding that Charles Colbert, deceased, the

right to whose estate is here involved, was the son of Nancy Cross Colbert as asserted by them.

The judgment and order appealed from are therefore reversed and the proceeding is remanded to the district court of Silver Bow county, with direction to dismiss the respondents' petition.

*Reversed and remanded.*

Mr. Chief Justice Brantly and Mr. Justice Holloway concur.

(Submitted November 6, 1915.   Decided December 22, 1915.)